**STAAR SURGICAL COMPANY,**
Defendant Below, Appellant,

v.

**Thomas R. WAGGONER and Patricia L. Waggoner, Plaintiffs Below, Appellees.**

Supreme Court of Delaware.

Submitted: Nov. 21, 1990.
Decided: April 8, 1991.
Rehearing Denied April 29, 1991.

David C. McBride (argued), Josy W. Ingersoll, Bruce L. Silverstein and Vincent J.X. Hedrick, II of Young, Conaway, Stargatt & Taylor, Wilmington, Todd E. Gordinier, Elizabeth W. Sachs and Joel F. McIntyre, of Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., of counsel, for appellant.

Lawrence A. Hamermesh (argued), and Alan J. Stone of Morris, Nichols, Arsht & Tunnell, Wilmington, Frederick R. Dettmer and Thomas Fenerty of LeBoeuf, Lamb, Leiby & MacRae, New York City, of counsel, for appellees.

Before CHRISTIE, C.J., MOORE and HOLLAND, JJ.

MOORE, Justice.

In this latest dispute between the parties we determine the validity of two million shares of STAAR Surgical Company ("STAAR") common stock issued to STAAR's former President and CEO, Thomas R. Waggoner and his wife, Patricia Waggoner ("Waggoner" or "Waggoners"). This is a continuation of the controversy between Waggoner and STAAR. We have already ruled that a provision of the preferred stock STAAR issued to Waggoner, purportedly giving him super-majority voting control of the company, was invalid. *See Waggoner v. Laster,* Del.Supr., 581 A.2d 1127 (1990) (*"Waggoner I"*). In *Waggoner I,* we did not otherwise decide the validity of the Waggoners' preferred and common shares.

In this action, the Court of Chancery assumed that the Waggoners' preferred shares were technically invalid because STAAR failed to issue them in conformity with 8 *Del.C.* § 151. *See Waggoner v. STAAR Surgical Co.,* Del.Ch., C.A. No. 11185, Jacobs, V.C., slip op. at 14 n. 7, 1990 WL 28979 (March 15, 1990) (*"Waggoner II"*). The trial court nonetheless determined that the Waggoners were equitably entitled to ownership and voting control of their common shares. *Id.* at 15–16.

We find that the Court of Chancery erroneously granted equitable relief. The Waggoners received their common stock through the exercise of their conversion options attached to the preferred shares. Since the preferred shares were invalid, the trial court had no basis to ignore established principles of Delaware corporate law and should not have invoked equitable remedies to resuscitate plainly void stock. Accordingly, we reverse.

## I.

We will only summarize the pertinent sections of the record in view of our extensive treatment of the facts underlying the dispute between Waggoner and STAAR in *Waggoner I,* 581 A.2d at 1128–33. STAAR was facing severe financial difficulties in 1987. At that time, STAAR had an open line of credit with the Bank of New York ("BONY") secured by certain of STAAR's account receivables and inventory. In September, 1987, STAAR's accountants caused the company to write-down its accounts receivables. The write-down left the BONY line of credit undercollateralized by almost two million dollars.

At approximately the same time, certain STAAR shareholders were concerned about the financial performance of the company. The stockholders conferred in November 1987, and later that month discussed their concerns directly with Waggoner. On December 13, 1987, the shareholders met with the STAAR directors in New York City. STAAR's outside counsel, Elliot Lutzker, informed the shareholders at the meeting that among other things, STAAR was overdrawn on its BONY line of credit and that BONY had "demanded" Waggoner's personal guarantee to secure all of STAAR's debt to the bank. The shareholders were outraged and demanded Waggoner's immediate resignation. The STAAR board and the shareholders reached a compromise providing for the election of two new outside directors.

The STAAR board then formally convened after the meeting on December 13, 1987. Waggoner told the board that BONY had demanded his personal guarantee of STAAR's debts. Waggoner advised the board that he would guarantee the debts only if he was given voting control of the company while the guarantees were outstanding. Waggoner and the board generally concluded at the end of the meeting that STAAR would issue some type of convertible securities to Waggoner in exchange for his guarantee. The two sides did not formally adopt or memorialize their understanding.

BONY then sent a formal letter to Waggoner three days later, on December 16, 1987, requesting his "immediate attention" to the matter of a personal guarantee. The letter required Waggoner to respond no later than noon on December 18, 1987. Lutzker informed both Waggoner and Lamar T. Laster, STAAR's Chief Financial Officer, that BONY could shut STAAR down if it did not receive Waggoner's personal guarantee.

Waggoner then called a special board meeting for December 17, 1987 to consider BONY's "demand." The meeting was hastily summoned and poorly organized. We previously described the meeting in *Waggoner I,* quoting the trial court's finding that:

> The December 17 meeting was conducted by telephone with little or no advance notice, and lasted for approximately 25 minutes. Dr. Utrata, a Board member of only four days' standing, participated between performing surgical operations. Mr. Ford, a trial attorney, participated while speaking from his car phone and while traveling between court appearances. According to the minutes, Mr. Silverman was absent for a portion of the discussion, and Mr. Sodero, a fourth director, intended to (and did) resign at the conclusion of that meeting, to be replaced by Dr. Brown.

*Waggoner I,* 581 A.2d at 1131–32 (quoting *Laster v. Waggoner,* Del.Ch., C.A. Nos. 11063, 11067, Jacobs, V.C., slip op. at 8, 1989 WL 126670 (Oct. 24, 1989)).

Waggoner informed the board of BONY's "demands" and reaffirmed his commitment to guarantee the debts in return for control of the company while the guarantee was outstanding. The directors discussed Waggoner's requests and the minutes of the meeting reflect that Laster proposed:

> [T]hat a convertible preferred stock be issued to Mr. Waggoner to enable him to have voting control as long as all of his guarantees are in effect. The guarantees would consist of all of the approximately $3.5 million of debt of STAAR and Frigitronics to BONY, the $1.8 mil-

lion IPPI guaranty and the $1.1 million owed to Maurry Brothers.... If all of the personal guarantees and stock pledges are removed within the next 30 days, or there is a binding agreement to such effect, Waggoner would not receive any compensation. If all guarantees were not removed within 30 days, Waggoner would receive 2 million shares of Common Stock as compensation for the personal risk assumed. During the period of time that certain of the Company's stockholders were trying to remove Tom Waggoner from the Company's debt they will have to agree in writing not to take any action detrimental to the Company or to Tom Waggoner.

The minutes of the December 17, 1987 STAAR Board meeting also state that the board formally adopted the following resolution:

RESOLVED, that pursuant to the authority granted to the Board of Directors in the Certificate of Incorporation, as amended, the Board hereby authorizes the creation of a series of Convertible Preferred Stock, all of which shall be held by Tom Waggoner, or his designees, which shall be converted into two million shares of Common Stock after January 16, 1988, unless all of the personal guarantees and stock pledges of Common Stock by Tom Waggoner now or hereafter in effect are removed, or a binding agreement to such effect is in place by January 16, 1988. In the event that all of the Waggoner guarantees are removed by January 16, 1988, all of the shares of Convertible Preferred Stock shall be redeemed by the Company at $.01 per share. In the event that the two million shares of Common Stock are issued to Tom Waggoner, all of the remaining Convertible Preferred and stock pledges are removed. Holders of the Convertible Preferred Stock shall be entitled to elect a majority of the Company's directors and to otherwise vote a majority of the Shares of Common Stock outstanding at any time. The shares of Convertible Preferred Stock, in accordance with the provision of the SEC's safe-harbor rule, shall have a liquidation

preference however, [sic] not entitle the holder to any dividends.

*See Waggoner I*, 581 A.2d at 1132 (quoting *Laster*, slip op. at 9–10).

In fact, the trial court found, and we affirmed in *Waggoner I*, that the board *never formally adopted* the resolution and only Waggoner signed the minutes. *See id.* at 1132.

After the board meeting, Lutzker prepared a certificate of designation pursuant to 8 *Del.C.* § 151(g), at some time between December 18, 1987 and December 24, 1987. The certificate allegedly established the rights, powers and preferences of the convertible preferred shares pursuant to the December 17, 1987 "resolution." The certificate also recited that it included the December 17, 1987 board resolution. The certificate was six pages long and contained detailed, comprehensive language regarding the voting, conversion and redemption rights of the preferred shares not mentioned in the December 17 resolution. *See Laster v. Waggoner*, Del.Ch., C.A. No. 11063, 11067, Jacobs, V.C., slip op. at 11–12 & n. 5, 1989 WL 126670 (Oct. 24, 1989). Furthermore, like the December 17 "resolution," the STAAR board never *formally adopted the certificate of designation. See id.* at 11. STAAR actually issued the preferred shares to Waggoner on December 18, 1987.

Some STAAR board members were dissatisfied with the terms of the preferred stock transaction and called a board meeting for January 11, 1988. At that meeting, the board attempted to delay the conversion feature of the preferred stock. On January 19, 1988, however, Waggoner exercised his conversion option and received two million shares of STAAR common stock. Allegedly, Waggoner's action was authorized pursuant to the resolution and the certificate of designation because STAAR failed to replace Waggoner's guarantee within the prescribed time limits.

In August, 1989, the Waggoners attempted to exercise the voting provisions of the remainder of their preferred shares by removing STAAR's board. The directors, aided by two shareholders, contest-

ed the election under 8 *Del.C.* § 225. On October 24, 1989, the Court of Chancery ruled that the super voting provisions of the preferred shares were invalid. *See Laster*, slip op. at 39–40. We affirmed that decision. *See Waggoner I*, 581 A.2d at 1137–38.

The Waggoners then filed an action pursuant to 8 *Del.C.* § 211 to compel STAAR to convene a shareholders meeting. STAAR answered the Waggoners' § 211 claim denying that the Waggoners even owned the two million STAAR shares. The Waggoners then moved pursuant to 8 *Del.C.* § 227(a) for an order determining their right to vote the disputed shares. On March 15, 1990, the Court of Chancery ruled that even though the Waggoners' preferred shares were invalid, they were entitled as a matter of equity to own and vote the disputed two million common shares which were derived from the invalid preferred stock. *See Waggoner II*, slip op. at 15–16.

## II.

The Court of Chancery specifically assumed that the *preferred shares* "were invalidly issued" because the board failed to formally adopt both the December 17 resolution and the certificate of designation as required by 8 *Del.C.* § 151. *See Waggoner II*, slip op. at 14 n. 7. Nonetheless, the trial court found that the Waggoners were entitled to an order "akin to specific performance" authorizing the issuance of the *common shares* and declaring them eligible to vote. *Id.* at 9. The court reasoned that Waggoner was equitably entitled to receive the two million shares of common stock as consideration for his personal guarantee of STAAR's debts. *Id.* at 9–10.

### A.

 The question of the validity of the Waggoners' common shares presents a mixed issue of law and fact. This Court, however, exercises plenary review of the trial court's determination of purely legal conclusions including the proper legal standard to judge the validity of shares in a 8

*Del.C.* § 227 action. *See Triplex Shoe Co. v. Rice & Hutchins, Inc.*, Del.Supr., 152 A. 342, 346 (1930).

 STAAR asserts two basic errors. First, it contends that the Court of Chancery erred in deciding that the Waggoners were entitled to vote their common shares despite the assumption that their preferred shares were "technically" invalid. Second, STAAR claims that the Court of Chancery erred in its award of "specific performance" to the Waggoners, even assuming that they were entitled to some form of equitable relief. STAAR specifically contends that: (1) the trial court lacked the authority to grant specific performance pursuant to 8 *Del.C.* § 227; (2) the Court of Chancery improperly found that STAAR had adequate notice of the Waggoners' equitable claim for specific performance and denied STAAR its right to develop a factual record in opposition to the claim; (3) there was an insufficient evidentiary basis for the trial court to conclude that the Waggoners lacked an adequate legal remedy; and (4) the Court of Chancery failed to consider Waggoner's alleged misconduct, including breaches of his fiduciary duties to the company. The Waggoners dispute all of STAAR's allegations.

It is unnecessary for us to address the merits of the trial court's application of the equitable remedy of something akin to "specific performance." Instead, we find that it was error to award any type of equitable relief after the trial court essentially concluded that the preferred shares were invalid. Waggoner obtained his common shares only after converting one share of his preferred stock into the common. If the preferred shares were void, it follows *a fortiori* that the common shares, which purportedly derived from the preferred, also were invalid.

### B.

We start with basic and clearly applicable provisions of the Delaware General Corporation Law. A corporation can issue more than one class of stock, including preferred shares with a conversion feature.

*See, e.g.,* 8 *Del.C.* §§ 151(a), (e) & (g). The powers, preferences, rights and other characteristics of such shares must be fixed in either the certificate of incorporation or through a board resolution adopted pursuant to an explicit grant of authority in the certificate of incorporation. *See* 8 *Del.C.* §§ 102(a)(4), 151(a). There is no dispute that the STAAR certificate of incorporation authorized the board to issue, by resolution, "blank check" preferred stock with such terms and conditions, including:

> [T]he rights, if any, of holders of the shares of the particular series to convert the same into shares of any other series or class or other securities of the corporation....

The Delaware General Corporation Law mandates adoption of a board resolution, when such new shares of so-called "blank check" preferred, are issued. Section 151(a) of the General Corporation Law requires, in part, that all new stock voting powers, designations, preferences and other special rights must either be in the certificate of incorporation or:

> [I]n the resolution or resolutions providing for the issue of such stock *adopted by* the board of directors pursuant to authority expressly vested in it by the provisions of its certificate of incorporation. 8 *Del.C.* § 151(a) (emphasis added).

Section 151(e), which specifically authorizes a company to issue convertible securities, requires, in part, that the corporation issue the new shares:

> [A]t such price or prices or at such rate or rates of exchange and with such adjustments as shall be stated in the certificate of incorporation or in the resolution or resolutions providing for the issue of such stock *adopted by the board of directors as hereinabove provided.* 8 *Del.C.* § 151(e) (emphasis added).

Finally, Section 151(g) requires a corporation to file a certificate of designation when the certificate of incorporation permits the board to issue new securities through a resolution "adopted by the board." The statute provides:

When any corporation desires to issue any shares of stock of any class or of any series of any class of which the powers, designations, preferences and relative, participating, optional or other rights, if any, or the qualifications, limitations or restrictions thereof, if any, shall not have been set forth in the certificate of incorporation or in any amendment thereto but shall be provided for in *a resolution or resolutions adopted by the board* of directors pursuant to authority expressly vested in it by the certificate of incorporation or any amendment thereto, a *certificate of designations setting forth a copy of such resolution* or resolutions and the number of shares of stock of such class or series as to which the resolution or resolutions apply shall be executed, acknowledged, filed, recorded and shall become effective, in accordance with § 103 of this title.... 8 *Del.C.* § 151(g) (emphasis added).

Waggoner concedes that the STAAR board never formally adopted either the board resolution on December 17, 1987, or the certificate of designation. Finally, the trial court found in *Laster* that the certificate of designation did not "set forth" a copy of the December 17, 1987 resolution. Slip op. at 11–12. Indeed, the court ruled that the certificate of designation contained materially different language from that in the resolution. *Id.* at 11 n. 5.

### C.

The parties' arguments seem to pass like two ships in the night. STAAR contends that the board's failure to adopt the resolution or the certificate of designation rendered the preferred shares void, thus invalidating the common stock. STAAR relies on *Triplex Shoe Co. v. Rice Hutchins, Inc.,* Del.Supr., 152 A. 342 (1930), for the proposition that illegally issued stock is void and, regardless of the equities, cannot be transferred or voted. The Waggoners, in contrast, focus on the common stock and not the preferred shares. They assert that even if the board failed to technically conform to the clear corporate law, the

STAAR directors all agreed at the December 17, 1987 board meeting to issue Waggoner two million shares of common stock as compensation for his guarantee of the BONY loans. Therefore, Waggoner claims, it was clear to all of the parties that he would eventually receive the two million shares if STAAR could not find alternate financing for the loan.

The Waggoners also contest STAAR's interpretation of *Triplex*, claiming that it is distinguishable on its facts. The Waggoners argue that the certificate of incorporation in *Triplex*, and the then current corporate law, did not authorize the board to issue new shares of a certain type of stock. Therefore, they contend, the stock in *Triplex* was void and subsequent board action could not have validated those shares. In contrast, the Waggoners argue that the STAAR certificate of incorporation at all times authorized the board to issue new shares of common stock and thus *Triplex* is not dispositive.

### D.

■ We must reject the Waggoners' attempt to separate the common shares from the preferred stock. We also reject their very limited interpretation of *Triplex*. Stock issued without authority of law is void and a nullity.

It is undisputed that Waggoner could not receive his common stock without exercising the conversion option of at least one preferred share. The December 17, 1987 resolution and the certificate of designation purportedly authorized the issuance of the preferred shares. Without validly issued preferred stock, there was simply no other legal mechanism by which the common shares could be issued. Simply stated, if the preferred shares were void, as the Court of Chancery assumed, then the common stock could not be created out of whole cloth.

Based on the trial court's findings, it is clear that the preferred convertible shares originally issued to the Waggoners were invalid and void under Delaware law. There was no compliance with the terms of 8 *Del.C.* § 151. The directors never formally adopted either the December 17, 1987 resolution or the certificate of designation.

The Waggoners' attempt to trivialize the unassailable facts of this case as mere "technicalities" is wholly unpersuasive. The issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters.

There are many interacting principles of established law at play here. First, it is a basic concept that the General Corporation Law is a part of the certificate of incorporation of every Delaware company. *See* 8 *Del.C.* § 394. Second, a corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders. *See Lawson v. Household Finance Corp.*, Del.Supr., 152 A. 723, 727 (1930). The charter is also a contract among the shareholders themselves. *See Morris v. American Public Utilities Co.*, Del.Ch., 122 A. 696, 700 (1923). When a corporation files a certificate of designation under § 151(g), it amends the certificate of incorporation and fundamentally alters the contract between all of the parties. *See* 8 *Del.C.* §§ 104, 151(g). A party affecting these interrelated, fundamental interests, through an amendment to the corporate charter, must scrupulously observe the law.[1]

■ Finally, it is a basic concept of our corporation law that in the absence of a clear agreement to the contrary, preferred stock rights are in derogation of the common law and must be strictly construed. *See generally Goldman v. Postal Telegraph, Inc.*, 52 F.Supp. 763, 767

---

**1.** We put aside the wholly inapplicable circumstances of correcting mistakes under § 103(f), or the reformation of corporate instruments to reflect the actual intention of the parties. *See, e.g., In re Farm Industries, Inc.*, Del.Ch., 196 A.2d 582, 592 (1963); *Waggoner I*, 581 A.2d at 1135–

36. However, the failure of STAAR's Board to approve the December 17 resolution and subsequent certificate of designation was not a mere mistake but reflected a total failure to conform with the corporation law.

 

(D.Del.1943); *Garrett v. Edge Moor Iron Co.*, Del.Ch., 194 A. 15, 18 (1937), *aff'd sub nom., Pennsylvania Co. For Ins. On Lines & Granting Annuities v. Cox*, Del. Supr., 199 A. 671, 673 (1938); *Penington v. Commonwealth Hotel Const. Corp.*, 151 A. 228, 234 (1930), *rev'd in part*, 155 A. 514 (1931); *Gaskill v. Gladys Belle Oil Co.*, Del.Ch., 146 A. 337, 340–41 (1929).

 ■ This principle of "strict construction" applies with equal force to the creation of preferred stock and its attendant rights, powers, designations and preferences. Accordingly, a board's failure to adopt a resolution and certificate of designation, amending the fundamental document which imbues a corporation with its life and powers, and defines the contract with its shareholders, cannot be deemed a mere "technical" error.

 Thus, we must reject the trial court's authorization of the two million shares of common stock on equitable grounds. Stock issued in violation of 8 *Del.C.* § 151 is void and not merely voidable. *See Triplex*, 152 A. at 347; D. DREXLER, L. BLACK & A. SPARKS, DELAWARE CORPORATION LAW AND PRACTICE § 17.02 at 17–23 n. 89 (1990). A court cannot imbue void stock with the attributes of valid shares.

### E.

 The Waggoners argue that the board's failure to ratify its resolution to issue the convertible preferred shares merely rendered the common stock voidable, not void. The Waggoners claim that, unlike *Triplex*, where this Court found that the corporation did not have the power or authority to issue no par stock, STAAR's charter specifically authorized the issuance of their two million shares of common stock. Therefore, the Waggoners conclude that the issuance of the two million shares of common stock was merely a voidable act.

 ■ The Court of Chancery has correctly recognized that the available form of eq-uitable relief depends on the facts of each case. If the stock is indeed void, then "cancellation is the proper remedy." However, if the stock is voidable then a court may grant " 'that form of relief [that] is to be most in accord with all of the equities of the case.' " *See Diamond State Brewery, Inc. v. De La Rigaudiere*, Del.Ch., 17 A.2d 313, 318 (1941) (quoting *Blair v. F.H. Smith Co.*, Del.Ch., 156 A. 207, 213 (1931)).

 We have already rejected the Waggoners' narrow reading of *Triplex* in *Waggoner I*, 581 A.2d at 1137–38. We cited to *Triplex* in *Waggoner I* for the proposition that the equitable doctrine of estoppel is inapplicable to agreements or instruments that violate either express law or public policy. *Id.* We also rejected the Waggoners' argument that *Triplex* was limited only to instances where a corporation illegally issued stock. *Id.* Accordingly, we ruled that the Waggoners could not invoke the equitable doctrine of estoppel to validate the super-majority voting rights associated with their preferred shares after the court had already declared those rights void under the corporation law. *Id.*

 ■ Parity of reason compels us to reach a similar result here. Under the present circumstances, the Court of Chancery had no basis to grant equitable relief "akin" to specific performance after it concluded that the Waggoners' preferred shares were invalid. Neither logic nor equity compel the validation of a legally void act.[2]

 The judgment of the Court of Chancery is

 REVERSED.

---

**2.** Again, we emphasize that our courts must act with caution and restraint when granting equitable relief in derogation of established princi-ples of corporate law. *See Alabama By–Products Corp. v. Neal*, Del.Supr., 588 A.2d 255, 258 (1991).