# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| PAUL NGUYEN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 11138-VCS |
| | : | |
| VIEW, INC., a Delaware corporation, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted: March 6, 2017
Date Decided: June 6, 2017

Theodore A. Kittila, Esquire of Greenhill Law Group, LLC, Wilmington, Delaware, and Tan Dinh, Esquire of CrossPoint Law, Palo Alto, California, Attorneys for Plaintiff.

R. Judson Scaggs, Jr., Esquire and Richard Li, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

In the fall of 2009, Defendant, View, Inc. ("View" or the "Company"), sought the consent of its stockholders to pursue a round of Series B preferred stock financing (the "Series B Financing") following a successful round of Series A preferred stock financing (the "Series A Financing") that had closed two years prior. Plaintiff, Paul Nguyen, View's founder and then-owner of approximately 70% of the Company's common stock, initially consented to the Series B Financing. Prior to the closing of the transaction, however, Nguyen purported to revoke his consent after determining that the restated governance documents related to the Series B Financing would dramatically diminish his rights as a stockholder. View contested Nguyen's right to revoke his consent and moved forward with the Series B Financing as if Nguyen had consented. Nguyen, in turn, pursued claims against the Company in binding arbitration, including a claim in which he sought declarations that his revocation of consent was valid and, therefore, the closing of the Series B Financing was "void and invalid."

While the arbitration was pending, View closed several more rounds of financing (raising approximately $500 million). One must presume that View understood that if the arbitrator found in favor of Nguyen on the consent issue, then the later rounds of financing that rested on the Series B Financing would collapse when that block was removed from the tower of blocks that comprised the Company's preferred stock offerings. On December 18, 2015, the arbitrator ruled,

1

*inter alia*, that Nguyen validly revoked his consent to the Series B Financing and that the closing of that round was "void and invalid." With that stroke of the pen, View's capital structure was turned upside down.

In an attempt to turn back time in order to restore the Series B Financing, beginning in early 2016, View undertook a series of steps intended to ratify the various charter amendments and other corporate acts it had purportedly authorized in connection with the several rounds of financing that closed after the Series A Financing—beginning with the now-void Series B Financing—pursuant to 8 *Del. C.* § 204 ("Section 204"). As part of this process, View's two Series A preferred stockholders converted their shares to common stock as they were permitted to do pursuant to the operative governance documents relating to the Series A Financing. This conversion had the effect of stripping Nguyen of his voting protections and majority stockholder status, thereby rendering his consent to effect the Series B and subsequent rounds of financing no longer necessary.

In his Amended Verified Complaint (the "Complaint"), Nguyen seeks a declaration from this Court pursuant to 8 *Del. C.* § 205 ("Section 205") that the Company's attempts to ratify the invalid rounds of financing were improper. View has moved to dismiss the Complaint on the ground that Nguyen has failed to plead facts that would support a reasonable inference that View's ratification was technically invalid or that it should be disregarded as a matter of equity under

2

Section 205. The parties' competing positions, while stated in terms set forth in Section 205, fundamentally raise the issue of whether View's attempt to ratify the invalid Series B Financing (and subsequent rounds) comports with Section 204.

For the reasons I explain below, Section 204 does not fit here because the Series B Financing was not a "*defective* corporate act" that is subject to ratification under Section 204. Rather, View's decision to proceed with the Series B Financing was an *unauthorized* corporate act—unauthorized because Nguyen has been deemed to have effectively revoked his consent to the transaction before it closed. View cannot invoke ratification to validate a deliberately unauthorized corporate act. The motion to dismiss must be denied.

## I. BACKGROUND

In considering Defendant's motion to dismiss, I have drawn the facts from the well-pled allegations in the Complaint, documents integral to the Complaint and matters of which I may take judicial notice.[1] At the motion to dismiss stage of the proceedings, I presume that all well-pled factual allegations in the Complaint are true.[2]

---

[1] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) ("A judge may consider documents outside of the pleadings only when (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents.") (internal quotation marks and citations omitted).

[2] *Id.*

## A. Parties and Relevant Non-Parties

Plaintiff, Paul Nguyen, a resident of California, is the owner of 4,537,500 shares of the common stock of View. He is the Company's founder and former President, Chief Technology Officer, Chairman of the board of directors, and a former member of its board of directors. He was terminated from his management positions and removed from the Company's board of directors prior to the filing of this litigation.

Defendant, View, is a Delaware closely-held corporation headquartered in Milpitas, California. View was incorporated on April 9, 2007, as Echromics, Inc. It changed its name to Soladigm, Inc. on October, 2, 2007, and then to View on November 8, 2012. View developed and now sells windows and commercial building glass that allows the light, heat, shade and glare properties of the glass to be controlled manually or electronically. This "switchable electrochromatic glass" is designed to reduce energy consumption and greenhouse gas emissions while improving comfort of living.

## B. Venture Capital Funds Invest in View

In 2007, View accepted investments from venture capital funds Sigma Partners Ventures ("Sigma") and Kholsa Ventures ("KV"). The two firms agreed to invest in View based on a $5 million pre-money valuation, in what became the Series A Financing. After the closing of the Series A Financing, Mike Scobey was

to take over the reins from Nguyen and become the new Chief Executive Officer of the Company.

As a result of the Series A Financing, Sigma and KV collectively held 16,666,666 shares of Series A preferred stock, which represented 50% of View's equity on a fully-diluted basis and 62% of View's outstanding shares. After the Series A Financing, Nguyen held 7,260,000 shares (or approximately 70%) of the Company's outstanding common stock and Scobey and a third individual owned the remaining 30%. The Company's common stock collectively represented approximately 30% of the Company's equity on a fully-diluted basis. An additional 6,666,667 shares of common stock were reserved for an option pool for future grants to employees and consultants. Nine months after the initial close of the Series A Financing, Sigma and KV acquired another 4,965,242 Series A preferred shares, bringing their total ownership to 56% of View's equity on a fully-diluted basis and 68% of the shares outstanding.

In connection with the Series A Financing, Nguyen and Scobey entered into a voting agreement with KV and Sigma. This agreement established the size and composition of View's board of directors (the "Board"), how each Board member would be selected, which stockholders would select the CEO and which stockholders would vote in Board elections. Through the voting agreement, KV and Sigma gained control of the corporate structure, composition of the Board, and selection of

5

the CEO. Both Sigma and KV agreed that each would vote for the other's Board designee. The voting agreement also provided some protection to Nguyen, as "Founder," by allowing him, *inter alia*, to name one member to the Board.

View adopted an Amended and Restated Certificate of Incorporation to reflect the Series A Financing, which was filed on May 22, 2007, with the Delaware Secretary of State. This gave Sigma and KV approval and veto rights for many corporate acts, including any "decision to pay or declare dividends, redeem securities, amend the certificate of incorporation and bylaws, create new classes of stock, adjust the size of the Board, or authorize a merger or acquisition."[3] Under the new governance scheme in place after the close of the Series A Financing, View would have a five-person Board, with Sigma and KV controlling four seats and Nguyen in the fifth seat.[4] The scheme contemplated that Nguyen's "only elements of protection [would be] (a) a class vote provision under 8 *Del. C.* § 242(b)(2) [("Section 242(b)(2)")],[5] requiring that any amendment to the Company's certificate

---

[3] Am. Verified Compl. ("Compl.") ¶ 20.

[4] The four seats controlled by KV and Sigma were comprised of one designee of each Sigma and KV, the CEO, whom Sigma and KV had the exclusive power to appoint and remove, and a member elected by the majority of the preferred and common stock (where KV and Sigma held the majority of the outstanding stock).

[5] Section 242(b)(2) states, in pertinent part, that "the holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would increase or decrease the aggregate number of authorized shares of such class, increase or decrease the

of incorporation changing the number of authorized shares of common stock, changing the par value of the common stock, or changing the rights or preferences of common stock be approved by holders of the majority of the common stock, and (b) the various rights under the [v]oting [a]greement relating to Nguyen's ability to approve changes to the size of the Board and to fill a seat on the Board, along with rights to information about the Company and its plans and actions."[6]

## C. View Terminates Nguyen and Engages in Further Financing Transactions

In December 2008, Raul Mulpuri became the new CEO of View which, under a new voting agreement dated February 21, 2008 (the "Voting Agreement"), granted him a seat on the Board. After Mulpuri was installed, View began to exclude Nguyen from Board meetings and to prevent him from accessing Board materials and other information. Thereafter, on January 9, 2009, Nguyen was removed as Chief Technology Officer of the Company due to his alleged "inability to perform."[7] One month later, his employment with View was terminated entirely.[8] At the same time, he was removed as a member and Chairman of the Board.

---

par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely."

[6] Compl. ¶ 22.

[7] Compl. ¶ 26.

[8] Upon his termination from the Company, 2,722,500 shares of the common stock owned by Nguyen were automatically redeemed by the Company pursuant to a stock restriction

View took all actions to separate Nguyen from the Company without either a Board or stockholder vote. Under the operative Voting Agreement and certificate of incorporation, however, Nguyen was entitled to a seat on the Board due to his position as the holder of a majority of the common stock. Asserting this and other grounds, Nguyen challenged View's actions to remove him as a manager and member of the Board and threatened litigation. The parties agreed to mediate before Nguyen filed suit.

On June 5, 2009, while the dispute over Nguyen's termination was pending, Sigma and KV caused View to amend its charter to authorize the issuance of convertible notes to Sigma and KV and to increase the number of authorized shares of common stock. Nguyen did not consent to these amendments, either as a Board member or the majority holder of common stock, as required by Section 242(b)(2). On August 27, 2009, View's charter was amended again so that it could issue further convertible notes to Sigma and KV and further increase the authorized number of shares of common stock. And again, Nguyen's approval was not sought or obtained for these amendments.

---

agreement, resulting in a reduction in Nguyen's ownership to 4,537,500 shares of common stock. Even with this reduction in ownership, Nguyen still held a majority of the outstanding shares of View's common stock.

8

The mediation between Nguyen and View regarding Nguyen's termination dispute was set to take place on September 18, 2009. A week prior to the scheduled mediation, View's attorneys informed Nguyen that View was working on a round of Series B Financing. View requested that Nguyen sign the various transaction documents related to the Series B Financing, including a stockholder consent to the Second Amended and Restated Certificate of Incorporation and a consent to change the terms of the then-operative Voting Agreement.

The documents revealed that while the Series B Financing would provide needed capital for the Company, it would otherwise not be favorable to Nguyen. Specifically, "(a) holders of common stock would no longer have any right to appoint any Board members; (b) Nguyen's consent right to any amendment to the [] Voting Agreement would be eliminated; and (c) View would be filing with the Delaware Secretary of State the [Second Amended and Restated Certificate of Incorporation] into which View had slipped a waiver of 8 *Del. C.* § 242(b)(2)" that would eliminate Nguyen's right as the majority common stockholder to approve any amendments to the certificate of incorporation changing the number of authorized shares of common stock.[9] Notwithstanding these elements that View knew were not

---

[9] Compl. ¶ 30.

favorable to Nguyen, View pushed Nguyen to consent to this dramatically altered governance structure because it needed his vote to proceed with the transaction.

At the mediation between View and Nguyen on September 18, 2009, Nguyen expressed his concern about the Series B Financing.

Nevertheless, View insisted that Nguyen consent to the transaction as a component of any broader resolution of Nguyen's termination claims. Ultimately, View and Nguyen reached a settlement (the "Settlement Agreement") that included Nguyen's consent to the Series B Financing and related transaction documents. Importantly, however, the Settlement Agreement allowed that either party could rescind the Settlement Agreement within seven days of its execution.

Following the mediation, Nguyen looked more closely at the transaction documents for the Series B Financing and realized that they would "(a) eliminate his class vote right in the Restated Certificate under 8 *Del C.* § 242(b)(2); (b) eliminate his approval right for any amendments under the Voting Agreement; (c) eliminate the right of the holders of common stock to elect any Board seat; and (d) eliminate his only Board seat together with his position as Chairman."[10] Nguyen believed that the effect of the Series B Financing on his interests in the Company, as reflected in the documents, was directly contrary to what had been represented to him at the

---

[10] Compl. ¶ 34.

mediation by the Company and its counsel. Accordingly, on September 24, 2009, before the seven-day revocation period expired, Nguyen served a notice of rescission of the Settlement Agreement on View, which included a rescission of his consent to the Series B Financing.

Unbeknownst to Nguyen, View had already proceeded to close the Series B Financing while the seven-day revocation period was still open. If the Series B Financing was deemed to be properly executed, Nguyen's interest in the Company would have been reduced from 23% of the overall equity and 70% of the common stock to approximately 3% of the Company's overall equity without any effective voting protections. When Nguyen discovered that the transaction had closed without his consent, he was, to put it mildly, not pleased.

**D. Nguyen Initiates Litigation and the Parties Engage in Arbitration**

On or about January 11, 2010, Nguyen filed suit in California state court to challenge, among other things, his termination from View and the validity of the Series B Financing. Soon thereafter, the parties to that action agreed to have the dispute adjudicated in arbitration by JAMS (the "JAMS Arbitration"). Nguyen, over time, amended his petition in the JAMS Arbitration to include claims regarding the invalidity of subsequent charter amendments and related transactions, including the Series C through F financings that had been undertaken by View while the

11

arbitration was pending. These later rounds raised over $500 million in additional investments.

The respondents in the arbitration quickly moved to enforce the Settlement Agreement which, if successful, arguably would have nullified Nguyen's revocation of his consent to the Series B Financing. In January 2011, the arbitrator denied this motion and ruled that Nguyen had properly revoked the Settlement Agreement. The issue of whether the revocation of the Settlement Agreement amounted to revocation of Nguyen's consent to the Series B Financing remained undecided.

On March 4, 2015, while the JAMS Arbitration was still pending, View filed two certificates of validation under Section 204, both of which sought to validate by ratification certain charter amendments that increased the authorized number of shares of stock (one filed December 17, 2009, the other filed March 8, 2012).[11] Nguyen responded on June 11, 2015, by filing this action under Section 205 to challenge View's attempt to correct its unauthorized amendments to its governance documents. Shortly after this action was filed, the parties stipulated to stay the action pending resolution by the JAMS arbitrator of the question of whether Nguyen had effectively revoked his consent to the Series B Financing.

---

[11] *See* Compl. Ex. E.

On December 18, 2015, the JAMS arbitrator issued his decision finding that Nguyen had properly revoked the Settlement Agreement, including his consent to the Series B Financing, thereby rendering the Series B Financing invalid and void.[12] This ruling effectively meant that all of the related transaction documents, including the Second Amended and Restated Certificate of Incorporation, were likewise invalid and void because Nguyen had not consented to them. Since each of the subsequent rounds of financing rested on the Series B Financing, the invalidation of the Series B effectively invalidated the Series C through Series F financings as well. The arbitrator's ruling also effectively reinstated the Voting Agreement from February 21, 2008, which provided that View's Board would be comprised of five members, one of whom Nguyen was entitled to designate.

### E. Holders of Preferred Stock Convert their Shares to Common Stock and Attempt to Validate the Series B through Series F Financings

After the JAMS ruling essentially blew up View's extant capital structure, the holders of View's Series A preferred stock scrambled to set things straight. They began by converting their preferred shares to common stock in January or February 2016. This conversion displaced Nguyen as majority common stockholder and, by its terms, cancelled the Voting Agreement since there were now less than 1 million

---

[12] *See* Compl. Ex. B.

shares of Series A preferred stock outstanding.[13]  With these changes in place, on February 26, 2016, View filed two certificates of correction and twenty-two certificates of validation with the Secretary of State, pursuant to Section 204, in which it purported to ratify various defective charter amendments and other corporate acts.  Of particular relevance here, View purported to ratify the Series B Financing that the JAMS arbitrator had ruled was void and invalid, and built off of that to ratify all subsequent financing rounds View had undertaken throughout the pendency of the JAMS Arbitration.[14]

Through the termination of the Voting Agreement, View reconstituted its Board from a five-member to an eleven-member Board, removing Nguyen from the Board in the process.  Soon after implementing these steps, View discovered that there were irregularities with its Board composition which, in turn, undermined the validity of the attempted ratifications.  Accordingly, in April 2016, View ratified and/or corrected its prior ratifications (collectively with the February ratifications, the "2016 Ratifications").

_____

[13] Transmittal Aff. of Richard Li in Supp. of Def. View, Inc.'s Opening Br. in Supp. of its Mot. to Dismiss the Am. Verified Compl. Ex. C (Voting Agreement) at 4 ("This Agreement shall terminate upon . . . such time as in the aggregate fewer than 1,000,000 shares of Series A Preferred Stock . . . are outstanding . . . .").  *See also* Compl. ¶ 51.

[14] View also sought to withdraw the two certificates of validation previously filed in March 2015, which formed the original basis of this action.

## F. Procedural Posture

Nguyen filed his Amended Verified Complaint on May 10, 2016, in which he challenges the certificates of validation from 2016 under Section 205 and the validity of certain corporate acts and the transactions related thereto. He also seeks to compel arbitration of this dispute. On June 23, 2016, View moved to dismiss the Complaint for failure to state a claim under Court of Chancery Rule 12(b)(6). After the oral argument on the motion to dismiss, I permitted the parties to file supplemental submissions regarding the question of whether the certificates of validation filed by View complied with Section 204. The last of those submissions was filed on March 6, 2017.

## II. ANALYSIS

View has moved to dismiss Count I in which Nguyen seeks to compel arbitration and Counts II through VIII in which he seeks declarations that the 2016 Ratifications are invalid. I will address Nguyen's demand that the matter be referred to arbitration only briefly as it appears he has now abandoned that claim. I will then turn to View's arguments that Nguyen's attempt to invalidate the 2016 Ratifications fails as a matter of law.

### A. Motion to Dismiss Standard

In considering this motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6):

15

(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonable conceivable set of circumstances susceptible of proof.'[15]

## B. The Arbitration Claim

In Count I of the Complaint, Nguyen seeks to compel View to arbitrate the claims relating to the 2016 Ratifications in the still-pending JAMS Arbitration. View argues that this count should be dismissed as "tactical maneuvering," particularly given the clear language in Section 205 that this court is vested with exclusive jurisdiction to adjudicate claims brought under the statute.[16] At the oral argument on the motion to dismiss on January 11, 2017, Nguyen's counsel agreed to stipulate to the dismissal of Count I.[17] The concession was well-founded. Count I is dismissed with prejudice.

## C. The Claims Relating to the 2016 Ratifications

View contends that it took pains to comply with Section 204 when undertaking the 2016 Ratifications and that the Court can declare as a matter of law and equity under Section 205 that Nguyen's challenges to those corporate acts must

---

[15] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[16] *See* 8 *Del. C.* § 205(e).

[17] Tr. of Oral Arg. on Def.'s Mot. To Dismiss ("Oral Arg. Tr.") 75. While the parties stated they would submit a stipulation of dismissal, no such stipulation has been filed.

16

be dismissed. Before addressing whether View's attempts to correct the "void" Series B Financing (and later rounds) should be validated under Section 205(d), I first must consider what the parties have referred to as the "gating issue" of whether the corporate acts that were the objects of the 2016 Ratifications were eligible for ratification under the remedial provisions of Section 204. Specifically, I must consider whether an act that the majority of stockholders entitled to vote deliberately declined to authorize, but that the corporation nevertheless determined to pursue, may be deemed a "defective corporate act" under Section 204 that is subject to later validation by ratification of the stockholders. The question presents an issue of first impression. To answer it, I turn to the plain language of the statute.[18]

### 1. The Relevant Statutory Provisions

Section 204 provides that "no defective corporate act or putative stock shall be void or voidable solely as a result of a failure of authorization if ratified as provided in this section or validated by the Court of Chancery in a proceeding

---

[18] 82 C.J.S. *Statutes* § 410 ("The starting point in statutory construction is to determine the legislative intent from the language itself. The statutory words should be given the meaning intended by the lawmakers. Where the statutory language is plain and the meaning is clear and unambiguous, the courts do not search for legislative intent beyond the express terms of the statute and must give effect to the language as written.") (footnotes omitted). *See also Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 227 (Del. 2010).

brought under § 205 of this title."[19]  It goes on to define a "defective corporate act"

as

> an overissue, an election or appointment of directors that is void or voidable due to a failure of authorization, or any act or transaction purportedly taken by or on behalf of a corporation that is, and at the time such act or transaction was purportedly taken would have been, within the power of a corporation under subchapter II of this chapter, but is void or voidable due to a failure of authorization.[20]

"Failure of authorization," in turn, is defined as

> (i) the failure to authorize or effect an act or transaction in compliance with the provisions of this title, the certificate of incorporation or bylaws of the corporation, or any plan or agreement to which the corporation is a party, if and to the extent such failure would render such act or transaction void or voidable; or (ii) the failure of the board of directors or any officer of the corporation to authorize or approve any act or transaction taken by or on behalf of the corporation that would have required for its due authorization the approval of the board of directors or such officer.[21]

Section 204 was adopted as a "safe harbor procedure" so that corporations can validate acts that would otherwise be void or voidable.[22]  The legislative synopsis

---

[19] 8 *Del. C.* § 204(a).

[20] 8 *Del. C.* § 204(h)(1).

[21] 8 *Del. C.* § 204(h)(2).

[22] Del. H.B. 127 syn., 147th Gen. Assem. (2013). The legislative synopsis is the "most prevalent source of legislative history for a Delaware statute" and has been held by our Supreme Court to be "'a proper source for ascertaining legislative intent.'" *Agar v. Judy*, 151 A.3d 456, 475 (Del. Ch. 2017) (quoting *Bd. of Adjustment of Sussex Cnty. v. Verleysen*, 36 A.3d 326, 332 (Del. 2012)).

explains that Section 204 was "intended to overturn the holdings in case law . . . that corporate acts or transactions and stock found to be 'void' due to a failure to comply with the applicable provisions of the General Corporation Law or the corporation's organizational documents may not be ratified or otherwise validated on equitable grounds."[23]

As the synopsis acknowledged, Section 204 was a legislative response to prevailing case law that had

> treated the statutory formalities for the issuance of stock as substantive prerequisites to the validity of the stock being issued, and [] determined that failure to comply with such formalities renders the stock in question void. A finding that stock [was] void [meant] that defects in it [could not] be cured, whether by ratification or otherwise. Thus, practitioners finding defects in stock issuances [were] put in the uncomfortable position of having to make a judgment whether the defect [was] one that render[ed] the stock void, in which case ratification [was] not an option, or voidable, in which case ratification [was] an option.[24]

Corporations were left with "few practical options" as the Court of Chancery was "required to treat the stock as void" and precluded from "giving effect to the relevant provisions of the Delaware UCC designed to validate defective stock in the hands of

---

[23] Del. H.B. 127 syn.

[24] C. Stephen Bigler & John Mark Zeberkiewicz, *Restoring Equity: Delaware's Legislative Cure for Defects in Stock Issuances and Other Corporate Acts*, 69 Bus. Law. 393, 394–95 (2014) (quoting C. Stephen Bigler & Seth Barrett Tillman, *Void or Voidable? – Curing Defects in Stock Issuances Under Delaware Law*, 63 Bus. Law. 1109, 1110 (2008)).

a purchaser for value."[25] "Accordingly, legislative intervention was necessary to resolve the statutory inconsistency and to otherwise address this issue."[26] "The legislative synopsis . . . suggests that the General Assembly drafted the law in hopes of creating an adaptable, practical framework for corporations and their counsel" whereby they could correct "mistakes made in the context of a corporate act without disproportionately disruptive consequences."[27]

### 2. The 2016 Ratifications did not Address Defective Corporate Acts

The 2016 Ratifications, all initiated on the purported authorization of Section 204, sought to ratify numerous charter amendments and equity issuances after the Series A preferred stockholders had converted their preferred stock to common stock. To understand their impact, it is necessary to rewind the clock to the timeframe following the Series A Financing leading up to the Settlement Agreement that was the subject of the parties' arbitration.

In 2009, before Nguyen signed the Settlement Agreement, he had the right under Section 242(b)(2), as the majority common stockholder, to approve any amendments to the Company's certificate of incorporation that would change the

---

[25] *Id.* at 400–01.

[26] *Id.* at 401.

[27] *In re Numoda Corp. S'holders Litig.*, 2015 WL 402265, at *8 (Del. Ch. Jan. 30), *aff'd*, 128 A.3d 991 (Del. 2015) (TABLE).

number of authorized shares entitled to vote and to approve any amendments to the then-operative Voting Agreement among the shareholders. The Settlement Agreement (that included Nguyen's consent to the Series B Financing) would have waived these rights. Nguyen's revocation of his consent, and the arbitrator's subsequent decision validating that revocation, rendered the Series B Financing and accompanying transaction documents invalid and void. This, in turn, reinstated the Voting Agreement, Nguyen's protection under Section 242(b)(2) as the holder of the majority of the common shares, and his entitlement to elect one of the five members of the View Board. It was in this context that the Series A preferred stockholders converted their shares and proceeded with the 2016 Ratifications, starting with the ratification of the Series B Financing documents to which Nguyen had refused to consent.

Based on the definition of "defective corporate act" found in Section 204, to be captured within the remedial purposes of the statute, the 2016 Ratifications must have been directed to acts that, "at the time such act[s] [were] purportedly taken[,] would have been[] within the power of a corporation under subchapter II of the chapter, but [were] void or voidable due to a failure of authorization."[28] View

---

[28] 8 *Del. C.* § 204(h)(1). The legislature provided more guidance on this definition in the synopsis for Section 204, explaining that: "The term 'defective corporate act' is intended to include all corporate acts and transactions . . . purportedly taken that were within the power granted to a corporation under this title but are subsequently determined not to have been effected in accordance with the applicable provisions of the General Corporation Law,

correctly points out that the Company had "the power" to "issue one or more classes of stock"[29] and to "issue . . . rights or options,"[30] in addition to the "powers and privileges . . . necessary or convenient to the conduct, promotion or attainment of the business or purposes set forth in its certificate of incorporation."[31] View is also correct that Section 204 expressly contemplates that a corporation may deploy the statute to ratify charter amendments and equity issuances, such as View purported to do with the 2016 Ratifications.[32] It is at this point in the analytical sequence, however, that View's Section 204 argument breaks down.

Section 204 makes clear that the defective corporate acts that a corporation purports to ratify must be within the corporation's power "*at the time such act was*

---

the corporation's certificate of incorporations or bylaws, or any plan or other agreement to which the corporation is a party, where the failure to comply with such provisions, documents or instruments would render such act void or voidable." Del. H.B. 127 syn.

[29] 8 *Del. C.* § 151.

[30] 8 *Del. C.* § 157.

[31] 8 *Del. C.* § 121.

[32] *See* 8 *Del. C.* § 204(e) (requiring the filing of a "certificate of validation" for the ratification of any act that would require the filing of a certificate with the Secretary of State, which includes amendments to and restatements of a certificate of incorporation); 8 *Del. C.* § 204(h)(1) (including an "overissue" in the definition of a defective corporate act); 8 *Del. C.* § 204(b)(1)(C) (discussing the requirements for of the resolutions that the board of directors of a corporation must adopt if the defective corporate act involves the issuance of shares of putative stock).

22

*purportedly taken.*"[33]   As determined by the arbitrator,[34] at the time the various corporate acts sought to be ratified by View through the 2016 Ratifications were purportedly taken, Nguyen enjoyed class voting protections as the holder of the majority of the common stock as well as the right to appoint one of the members of the Board of Directors pursuant to the Voting Agreement.  The 2016 Ratifications must be viewed in light of that operative reality.  Through this lens, it is clear that, at the time View purported to proceed with the Series B Financing, it did so notwithstanding that the majority common stockholder had deliberately withheld his consent for the transaction—consent that was required for the transaction to be valid as a matter of law.  Therefore, at the time the defective corporate acts at issue here were taken, the Company did not have the power to take these acts because its majority common stockholder had declined to approve them.

What occurred when Nguyen revoked his consent to the Series B Financing was much more than a mere "failure of authorization" as contemplated by Section 204.  It was the classic exercise of the stockholder franchise to say "no" to

---

[33] 8 *Del. C.* § 204(h)(1) (emphasis added).

[34] I do not pass on the correctness or validity of the arbitrator's determination regarding the *bona fides* of Nguyen's revocation of consent or the resulting impact on the Series B Financing.  That issue has been decided and is not joined in this action.

a Board-endorsed proposal.[35] To reiterate, in the context of a required stockholder vote, Section 204 defines "failure of authorization" as "the failure to authorize or effect an act or transaction in compliance with the provisions of this title [or] the certificate of incorporation or bylaws of the corporation . . . if and to the extent such failure would render such act or transaction void or voidable."[36] The plain meaning of "failure" in this context is distinct from a "no" vote or outright rejection of the proposal by the majority of stockholders entitled to vote. The reason the Series B Financing was declared void was not that View failed to comply with the Delaware General Corporation Law or its own governance documents in securing the stockholders' approval of the transaction; the transaction was void because the majority common stockholder deliberately rejected it.

Lest there be any lingering doubt regarding the distinction between a "failure" to authorize and a "rejection" of a corporate proposal, the plain meanings of these terms brings the matter into inescapable focus.[37] "Failure" has been defined as

---

[35] *In re First Boston, Inc. S'holders Litig.*, 1990 WL 78836, at *7 (Del. Ch. June 7, 1990) (noting that the stockholders' "power to say no is a significant power").

[36] 8 *Del. C.* § 204(h)(2).

[37] *See Freeman*, 3 A.3d at 227–28 (observing that Delaware courts frequently refer to dictionary definitions when searching for the plain meaning of statutory terms); 1 *Del. C.* § 303 ("Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language.").

"omission of occurrence or performance";[38] "a lack of success";[39] "deficiency; lack; want";[40] "[a]n omission of an expected action, occurrence, or performance."[41]  In contrast, to "reject" means "to refuse to accept, consider, submit to, take for some purpose, or use."[42]

According to View, "[a]n action is either consented to, or it is not, and a decision by stockholders not to consent to an action is not a 'rejection' of the act that precludes the Company from later taking action to certify it."[43]  I disagree.  First, as noted above, View's interpretation of Nguyen's revocation of his consent to the Series B Financing is contrary to the plain meaning of the words "failure" and "rejection."  It also diminishes the import of the stockholders' right to vote "no."[44]

---

[38] Merriam-Webster's Collegiate Dictionary (10th ed. 1996).

[39] *Id.*

[40] Black's Law Dictionary (10th ed. 2014).

[41] *Id.*

[42] Merriam-Webster's Collegiate Dictionary (10th ed. 1996).

[43] Def. View, Inc.'s Opening Br. in Supp. of its Mot. to Dismiss the Am. Verified Compl. 48 n.24.

[44] *See First Boston*, 1990 WL 78836, at *7.  *See also Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 313 (Del. 2015) ("Where the real parties in interest—the disinterested equity owners—can easily protect themselves at the ballot box *by simply voting no*, the utility of a litigation-intrusive standard of review promises more costs to stockholders in the form of litigation rents and inhibitions on risk-taking than it promises in terms of benefits to them.") (emphasis added).

As View's counsel conceded at oral argument, View's construction of Section 204 would allow a corporation to ratify an act that stockholders years earlier had expressly voted not to take and to certify that act as effective on the date the stockholders rejected it.[45] Nothing in the text of the statute or its legislative history suggests that the General Assembly intended to facilitate such a result.[46]

View adds another layer of complexity to the cause and effect paradigm of time travel by arguing that because it had the right to convert its Series A preferred stock to common prior to the Series B Financing, the Court should consider View's

---

[45] Oral Arg. Tr. 36:20–40:14.

[46] The legislative synopsis for Section 204 explains that the statute "is intended to overturn the holdings in case law, such as *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130 (Del. 1991) and *Blades v. Wisehart*, 2010 WL 4638603 (Del. Ch. Nov. 17, 2010), that corporate acts or transactions and stock found to be 'void' due to a failure to comply with the applicable provisions of the General Corporation Law or the corporation's organizational documents may not be ratified or otherwise validated on equitable grounds." Del. H.B. 127 syn. In *STAAR Surgical*, a corporation violated 8 *Del. C.* § 151 in connection with a stock issuance when its board of directors failed to adopt a board resolution authorizing the issuance of the shares, board minutes that referenced the successful board vote and a certificate of designation of the issuance of shares. 588 A.2d at 1132–33. Due to the failure formally to adopt these documents, the Supreme Court reversed the Court of Chancery's decision to remedy the defects upon concluding that the Court of Chancery had overstepped its equitable powers and that the company's unwitting failure to comply with the applicable statute was fatal to the stock issuance. *Id.* at 1134. In *Blades*, the court found that the former board of directors of a company had not validly adopted a stock split where there not had been "scrupulous adherence to statutory formalities" set forth in 8 *Del. C.* § 242, but instead had adopted "a resolution to amend the company's certificate of incorporation; a corresponding certificate of amendment increasing the number of authorized shares from 10,000,000 to 50,000,000; a later resolution referencing a split; and the company's stock ledger documenting the purported split." *Numoda*, 2015 WL 402265, at *8 (describing the decision in *Blades*, 2010 WL 4638603). These instances reflect classic "failures to authorize" corporate acts, not the "rejection" of a corporate act as occurred here.

26

attempt to ratify the Series B Financing as if View had made the conversion prior to the transaction, and not well after it actually occurred. In this alternative version of history, Sigma and KV converted their preferred stock to common, gained majority stockholder status and voted their common stock to approve the Series B Financing to overcome Nguyen's minority opposition to the transaction.[47]

Section 204 is not a "license to cure just any defect."[48] Indeed, it cannot be "used to authorize retroactively an act that was never taken but that the corporation now wishes had occurred, or to 'backdate' an act that did occur but that the corporation wishes had occurred as of an earlier date."[49] Yet this is exactly what View attempts to do: backdate an act that was expressly rejected by Nguyen, the majority holder of the common stock whose authorization was required, by retroactively converting Sigma and KV's Series A preferred stock to common stock even though those preferred stockholders have for several years enjoyed the benefits that attached to their preferred stock.[50]

---

[47] Def. View, Inc.'s Reply Br. in Further Supp. of its Mot. to Dismiss the Am. Verified Compl. 5 n.4 ("Sigma and [KV] converted their Series A Preferred Stock to common stock, as they were entitled to at the time of the original approval of the Series B Charter (and at all times since the Series B financing), and voted in favor of the 2016 Ratification[s] in order to protect View's capital structure.").

[48] *Numoda*, 2015 WL 402265, at *8.

[49] *Id.* at *9 (quoting Bigler & Zeberkiewicz, *supra*, at 403).

[50] During the six years the dispute over the Series B Financing was pending, as holders of Series A preferred stock, KV and Sigma enjoyed: "(a) board management rights; (b)

27

I note that no decision of this court or our Supreme Court has applied Sections 204 or 205 in a circumstance where a board of directors sought to employ statutory ratification as a means to alter the outcome of a stockholder vote. Rather, our courts have blessed efforts to ratify defective corporate acts where the failure of authorization was the product of: (1) a board failure to adhere to the corporate formalities required to authorize a stock issuance;[51] (2) technical dating discrepancies in shareholder consents;[52] (3) improper notice to stockholders;[53] (4) "missing records issues, timing issues, authority issues, and validity of board and stock issues;"[54] or (5) a failure properly to seek the required approval from either a

---

liquidation preferences; (c) participation rights; (d) registration rights related to IPOs; (e) rights of first refusal in the sale of the Company's stock; and (f) veto rights related to (i) charter and bylaw amendments, (ii) dividends and distributions, (iii) stock redemptions, (iv) increases and/or decreases in any authorized number of common or preferred shares of stock, (v) mergers, acquisitions, or sales of assets, and (vi) other corporate acts." Compl. ¶ 52.

[51] *Numoda*, 2015 WL 402265, at *10–12; *Steinberg v. Townley*, C.A. No. 12539-VCL, at *5–6, 37 (Del. Ch. Feb. 27, 2017) (TRANSCRIPT); *In re Xencor, Inc.*, C.A. No. 10742-CB, at *6, 51 (Del. Ch. Dec. 10, 2015) (TRANSCRIPT) (describing the ratifications that were being approved under Section 205 as "technical defects").

[52] *In re Trupanion, Inc.*, C.A. No. 9496-VCP, at *9–10, 16 (Del. Ch. Apr. 28, 2014) (TRANSCRIPT).

[53] *Xencor*, C.A. No. 10742-CB, at *6; *Trupanion*, C.A. No. 9496-VCP, at *10.

[54] *In re Wine.com, Inc.*, C.A. No. 10401-VCG, at *14–19 (Del. Ch. Apr. 16, 2015) (TRANSCRIPT).

28

board of directors or stockholders.[55] None of these decisions, either expressly or by analogy, support the use of Section 204 to undo a stockholder vote rejecting a transaction proposed by the company's board of directors.[56]

I am satisfied that Nguyen has pled facts that support his prayers for declaratory judgments that the 2016 Ratifications cannot be sanctioned under any reading of Section 204. Accordingly, I need not reach View's arguments that Nguyen has failed to plead technical non-compliance with Section 204 or its arguments that Nguyen has failed to plead that enforcement of the 2016 Ratifications would be inequitable under the factors set forth in Section 205(d).[57]

---

[55] *Trupanion*, C.A. No. 9496-VCP, at *12, 14.

[56] I note for the sake of completeness that View does not contend that the 2016 Ratifications ratified either Nguyen's vote against the Series B Financing through his revocation of the Settlement Agreement or his allegedly improper removal from the Board of Directors. *See* Letter to the Honorable Vice Chancellor Slights from R. Judson Scaggs, Jr. dated Mar. 6, 2017 in response to Pl.'s Feb. 20, 2017 Letter regarding supplemental briefing on the "Gating Issue" (Transaction ID 60296587) 5 ("The 2016 Ratification[s] did not ratify removing Nguyen as a director, so it is *irrelevant* whether removal of a director could be a defective corporate act."), 7 ("The 2016 Ratification[s] did not ratify a stockholder vote, so it is irrelevant whether a stockholder vote is a 'defective corporate act.'").

[57] I appreciate that the declarations Nguyen seeks here, if granted, will be problematic if not potentially devastating for View. That View placed itself in this bind by aggressively pursuing multiple rounds of financing while the outcome of the arbitration remained uncertain is, I am certain, cold comfort. Section 204 fully occupies "the decisional space" here, however. *Cf. TCV VI, LP v. TradingScreen, Inc.*, 2015 WL 1726442, at *1 (Del. Ch. Mar. 27, 2015) (noting that the statute at issue there did not "exclusively occupy the decisional space" and that the court had authority to render its decision as a matter of contract). Section 204 was intended, in part, to address instances where this court's attempts to exercise its equitable powers to correct defective corporate acts had been struck down by our Supreme Court. *See* Del. H.B. 127 syn. While I acknowledge some urge to "do equity" here, "[c]ourts of equity cannot create new substantive rights under the guise

29

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is GRANTED as to Count I of the Amended Verified Complaint and DENIED as to the remaining Counts. The parties should confer and promptly submit a proposed case scheduling order.

**IT IS SO ORDERED.**

---

of 'doing equity.'" *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 22 (Del. Ch. 1992). Any attempt to sustain View's attempted ratification on equitable, rather than statutory, grounds would surely find no endorsement at the next level of review. *See, e.g.*, *STAAR Surgical*, 588 A.2d 1130 (Del. 1991). Having determined that Section 204 does not fit here, I am satisfied that I cannot fill that void with a make-shift equitable remedy.