# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CAMDEN FOLEY and SAMUEL BERTAIN, )
)
)
Plaintiffs, )
)
v. )  C.A. No. 2023-0186-JTL
)
SESSION CORP., ESTHER LENOIR )
RAMIREZ, and VINH PHO, )
)
Defendants. )

## POST-TRIAL OPINION

Date Submitted: June 11, 2025
Date Decided: September 9, 2025

Thad J. Bracegirdle, Emily L. Skaug, BAYARD, P.A., Wilmington, Delaware; *Attorneys for Plaintiffs.*

Alisa E. Moen, MOEN LAW LLC, Wilmington, Delaware; Brian Gottesman, GABELL BEAVER LLC, Wilmington, Delaware; Brian D. Hail, ALLEN MATKINS LLP, New York, New York; *Attorneys for Defendants.*

**LASTER, V.C.**

Four close friends formed a cannabis accessories company. Three of them kept their day jobs, worked for the company part time, and contributed $10,000 each as startup capital. One of them became the Chief Executive Officer ("CEO") and worked for the company full time. Each received 25% of the company's shares.

As the company grew, the CEO began participating in a startup incubator. She concluded that the equal-ownership structure with only one founder working full time would deter potential investors. She pushed for an equity restructuring that would reflect her leadership role. One of the co-founders supported the idea. The other two opposed it.

The co-founders mediated their disagreement over the equity restructuring. The two opponents of the plan agreed to give up part of their equity, relying on the proponents' promise to enter into a founders agreement that would protect the minority holders. The restructuring went forward, giving the CEO and her supporter majority control.

After the restructuring, the CEO and her supporter did not follow through with the founders agreement. The company performed below expectations, and its burn rate became unsustainable. The CEO terminated the two minority co-founders and caused the company to purchase their shares for trivial consideration.

The minority co-founders sued the CEO, her supporter, and the company. They asserted claims for conversion, fraud, and breach of fiduciary duty.

This post-trial opinion rules in favor of the plaintiffs on their conversion claim. Otherwise it rules in favor of the defendants. In lieu of damages, the court rescinds

the transactions by which the plaintiffs lost their shares. The court also awards the plaintiffs expenses (including attorneys' fees) relating to a discovery dispute.

## I. FACTUAL BACKGROUND

The facts are drawn from the post-trial record. The parties introduced 271 exhibits, submitted depositions and live testimony from four witnesses, and agreed on twenty-nine stipulations of fact.[1] Having assessed the credibility of the witnesses and weighed the evidence as a whole, the court makes the following factual findings by a preponderance of the evidence.

### A. The Company

In 2016, Esther Lenoir Ramirez worked at a cannabis accessories company she had co-founded. She hired Camden Foley to design a line of glass smoking accessories. Foley worked at IDEO, a design consultancy. He tapped two friends and co-workers—Vinh Pho and Samuel Bertain—for help. The four worked closely together and completed the project.[2]

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits. The factual stipulations were disappointingly few.

[2] Ramirez testified credibly at trial. Her account was internally consistent and corroborated by contemporaneous documents. She acknowledged that she was not the company's sole director in January 2022, when she purported to act unilaterally by written consent, even though that was disadvantageous to her position on certain issues. This decision relies heavily on her testimony. Bertain and Foley also generally testified credibly, and this decision relies in part on their accounts.

Unlike Ramirez, Foley, and Bertain, Pho did not testify credibly at trial. He repeatedly professed not to recall or know the answers to straightforward questions.

2

In February 2017, Ramirez's company shut down. After she and Foley reconnected, they launched the glassware accessory line under a new brand.

That summer, Ramirez, Foley, Pho, and Bertain (collectively, the "Founders") launched Session Corp. (the "Company"). Bertain, Foley, and Pho planned to continue working at IDEO; each contributed $10,000 in startup capital. Ramirez planned to work full time for the Company. She would contribute sweat equity.[3]

The Company's mission was to modernize and destigmatize cannabis accessories. It would neither produce nor sell cannabis products. On May 2, 2017, Ramirez filed the Company's certificate of incorporation (the "Charter").[4] It authorized ten million shares of common stock and named Ramirez as the sole member of the Company's Board of Directors (the "Board"). That was a matter of convenience. The Founders were making decisions collectively; there was no decision to give Ramirez exclusive board-level authority.

---

When he gave answers, they were often rambling or nonresponsive. At times, Pho testified at trial on subjects where he claimed ignorance during deposition. Overall, he seemed more evasive than sincere. This decision gives little weight to Pho's testimony.

[3] Bertain personally contributed $2,000; he borrowed another $8,000 from Pho and contributed that as well. Even though the contributions were equity capital, the Company accounted for them as loans. *See* JX 267–69.

[4] JX 1.

On May 3, 2018, Ramirez adopted the Company's bylaws (the "Bylaws").[5] On May 7, acting by written consent as the sole director, Ramirez appointed herself President and CEO, Secretary, and Treasurer.[6] The consent granted the CEO the power "to appoint, supervise, and remove additional subordinate officers, agents, and employees of Session."[7] It also issued 2,000,000 shares to each Founder.[8]

That same day, Ramirez issued four stock grant notices. The notices informed the Founders that each had been issued 2,000,000 shares, with 25% of the shares vesting each year. Ramirez told her co-Founders that the vesting schedule was "standard" and would "protect[ ] the overall company, for instance, if someone decides they want to leave."[9] She also told them that if the Company later wanted to raise capital, "having super short vesting times is a red flag."[10] Bertain and Pho responded enthusiastically. Foley was more cautious, writing: "I guess I am fine with 48 month vesting. I still believe it is excessive."[11]

---

[5] JX 2.

[6] JX 4.

[7] *Id.*

[8] *Id.*

[9] JX 9.

[10] *Id.*

[11] *Id.*

4

The other Founders chose officer titles for themselves. Pho called himself the Chief Operating Officer, Bertain called himself the Chief Creative Officer, and Foley called himself the Chief Product Officer. On September 18, 2018, Bertain and Pho joined the Board. For unexplained reasons, Foley did not join until the next day.

## B. A Positive Start

In October 2018, the Company launched its first product: a glass pipe. The Company initially manufactured 200 pipes. The product caught fire, and the Company went from "one or two sales" per day to "a $2,000 day of sales."[12] By November 2018, the Company had sold all of its product. To obtain more inventory and fund a second product, Foley secured a loan from his father, Warren Foley.[13] The Company operated at a loss in 2018.

In 2019, the Founders sought capital from friends and family. They raised approximately $155,000, largely from Foley's contacts.

The Company expanded its offerings to include ashtrays, stash jars, and water pipes. The Company marketed its products through a branded website, social media, and online media placements.

Ramirez worked full time and managed the day-to-day operations. The other Founders pitched in on nights and weekends. They used Ramirez's apartment as the

---

[12] Ramirez Tr. 255.

[13] Foley Tr. 86–87.

5

Company's headquarters. The Company was still operating at a loss, and Ramirez covered her personal expenses—including rent—by tending bar.[14]

In February 2020, Ramirez asked the other Founders to award her a greater share of the equity and authorize the Company to pay her a salary. The other Founders refused, maintaining they all were contributing equally. That was objectively inaccurate, but "[t]he weakness of human nature prevents men from being good judges of their own deservings,"[15] and "soundness of judgment is easily obscured by self-interest."[16]

## C.    The Company's Need For Working Capital

In March 2020, demand for the Company's products surged with the onset of the COVID-19 pandemic. But the Company lacked the working capital to order and maintain adequate inventory. The Company also could not hire help to address the influx of orders. Ramirez reallocated resources to sales by curtailing marketing and delaying new products.

The Company also faced difficulties because of regulatory restrictions. Cannabis remains illegal under federal law, and even though the Company only

---

[14] When one of her roommates moved out in early 2019, Ramirez used that space for the Company. She fronted approximately $12,000 in rent for the space before eventually being reimbursed in 2020. Ramirez Tr. 260–61.

[15] Louis D. Brandeis, *Other People's Money: And How The Bankers Use It* 16 (1933).

[16] *Id.* at 135.

6

operated a cannabis-adjacent business, banks did not acknowledge the distinction. The Company could not even open a bank account, much less secure a loan.

**D.    Ramirez Seeks Advice.**

In summer 2020, as part of a plan to raise equity capital, Ramirez connected with Molly Fehlig, a startup advisor. Fehlig invited Ramirez to join the HER Digital Incubator, a startup incubator for female founders.

In fall 2020, Ramirez again asked her co-Founders for additional equity, this time laying out the case that she was contributing more than anyone else. Pho agreed. Bertain was skeptical. Foley rejected the idea.

In April 2021, Ramirez participated in a six-week incubator module about raising capital. She concluded that having four equal co-founders, three of whom had never worked full time for the Company, would suggest to investors that the Company lacked a clear leader and faced a risk of deadlock. She believed investors would expect a more typical structure with a founder-CEO holding a dominant equity stake. She felt the Founders needed to restructure the Company's equity to attract investors. She shared her beliefs with the other Founders.

Through the incubator, Ramirez also learned about the Simple Agreement for Future Equity ("SAFE"). That instrument allows an investor to contribute capital in exchange for the right to receive equity triggered by a future event. Early-stage startups use SAFEs to raise capital without a near-term valuation.

Ramirez estimated that the Company needed to raise $1.5 million for product development, marketing, and hiring. She thought the Company was a good candidate

7

for using SAFEs: It had a promising business model, but was difficult to value because it lacked consistent cash flow and needed to gain scale.

On May 4, 2021, Ramirez emailed an attorney who represented startup companies. Identifying herself as the Company's CEO, she outlined three goals: (1) redistribute equity fairly, (2) increase the unallocated equity pool, and (3) document a governance arrangement. She noted, "We do not have a founder operating agreement, and I believe we need to beef up the language in our shareholder agreement."[17] Ramirez and the startup attorney spoke several times. The attorney ultimately recommended reallocating the equity and imposing a new four-year vesting schedule.[18]

Around the same time, Ramirez revisited the equity restructuring with her co-Founders. She presented a strong case based on her disproportionate efforts, the lessons she learned from the incubator fundraising module, and the startup attorney's advice. Pho already supported a restructuring. Bertain remained skeptical but agreed. Foley opposed the idea, but agreed to go along with the majority.[19]

## E.    The SAFE Round

In spring 2021, Ramirez led an effort to raise outside funding. She and Fehlig created financial projections for the Company that supported a pre-money valuation

---

[17] JX 99 at 6–7.

[18] *Id*. at 2.

[19] Foley Tr. 154, 156; Ramirez Tr. 313–18, Bertain Tr. 671–73.

of $12 million. Their SAFE template contemplated a post-money valuation cap of $14 million, representing the highest valuation at which the Company would issue shares of preferred stock to SAFE investors if there was a later financing or a liquidity event.[20]

Ramirez created a pitch deck and tapped her network. By July 2021, Ramirez had circulated the fundraising documents to and spoken with many investors. She believed that to secure funding, she needed to have clear answers about the Company's cap table and leadership.[21] But the Founders continued to debate the details of the equity restructuring.

That fall, the Company raised approximately $960,000 through SAFEs, less than the $1.5 and $2 million Ramirez had targeted. It was enough for Pho and Bertain to join the Company full time and for Ramirez to begin receiving a salary.

In September 2021, Ramirez contacted an executive coach to mediate a discussion about the equity restructuring. Over the next two months, the coach worked with the Founders to prepare for the mediation. Each received an overview of the mediation process, a restructuring worksheet, and a template for an opening statement.

The mediation occurred in November 2021. Ramirez shared her frustrations with the lack of closure on the equity restructuring. She also shared her fear that the

---

[20] *See, e.g.*, JX 42A (the SAFE template); JX 28 (executed SAFE).

[21] Ramirez Tr. 320–21.

other Founders would leave with vested equity. Bertain and Pho generally agreed that Ramirez should receive a larger equity stake. Foley believed as a matter of principle that the Founders were equal, but he was prepared to go along with the restructuring. He also agreed that Ramirez was "owed something for her full time work the past three years."[22] He proposed that Ramirez receive 27%, Pho get 26%, and he and Bertain end up at 24% each.[23]

Ramirez and Pho wanted more than that. The Founders ultimately signed a mediation agreement that allocated 26.5% to Ramirez, 24.5% to Pho, and 19.5% each to Foley and Bertain, plus a 10% employee option pool (the "Mediation Agreement").[24] They committed to work with the startup attorney to formally document their agreement by December 31, 2021.

Foley and Bertain thought the Mediation Agreement was part of a larger deal that included a founders agreement to protect them as minority stockholders (the "Founders Agreement").[25] At trial, Foley testified that he agreed to give up equity in reliance on the promise of the Founders Agreement.[26] Ramirez and Pho thought the

---

[22] JX 257 at 3.

[23] *Id.* at 6.

[24] JX 78.

[25] *See* Foley Tr. 54–55; Bertain Tr. 644–46.

[26] Foley Tr. 53–54.

10

Mediation Agreement stood on its own. They claim that the Founders Agreement did not come up until April 2022.

Both sides are partly right. After the mediation, the executive coach sent the Founders an example of a "Team Charter."[27] Although it did not contain explicit minority stockholder protections, it established a framework for discussing the Founders' different roles. The existence of the Team Charter and Foley and Bertain's credible testimony persuasively establish their reasonable understanding that they would receive legal protection in exchange for reducing their equity stake. Ramirez and Pho are correct that no one had yet referred to the document as a "Founders Agreement," but its existence was part of the deal.

## F.    Documenting The Restructuring

In December 2021, Ramirez contacted the startup attorney and asked for formal agreements to implement the Mediation Agreement. The startup attorney provided her with a set of agreements.[28] The only agreements pertinent to this case are the Share Cancellation and Release Agreements that Foley and Bertain signed (the "Stock Cancellation Agreements") and the Stock Restriction Agreements that all of the Founders signed.

---

[27] JX 255.

[28] JX 99C; JX 99D; JX 106; JX 108; JX 109; JX 112; JX 121; JX 122.

In the Stock Cancellation Agreements, Foley and Bertain each agreed that 50,000 of their 2,000,000 shares were "cancelled."[29] In the Stock Restriction Agreements, the Founders agreed that their shares became unvested.[30] The Stock Restriction Agreements imposed a new vesting schedule under which 25% of the shares would vest after twelve months of employment. From then on, 1/48th of the remaining shares would vest each month. The Stock Restriction Agreements gave the Company the right to repurchase any unvested shares for nominal consideration of one one-thousandth of one cent ($0.00001) if the Founder's employment terminated.[31]

On January 19, 2022, the startup attorney sent the agreements to Ramirez. On January 20, she confirmed receipt and asked "[f]or the timeline to buy back shares timeline—just to confirm this is a right to buy unvested shares should my partner(s) leave prior to their full vest date?"[32] She remained laser focused on the Company's ability to buy a departing Founder's shares.

On January 24, 2022, Ramirez sent the agreements to Foley and Bertain.[33] Bertain signed the next day. Foley did not sign until March.[34]

---

[29] *See* JX 105; JX 110.

[30] *See* JX 106; JX 109.

[31] JX 106 § 1(a). If the Founder was terminated for cause, then the Company could repurchase both vested and unvested shares. *Id.*

[32] JX 102 at 1.

[33] *See* JX 105; JX 110; JX 106; JX 107; JX 109.

[34] *See* JX 113.

On January 31, 2022, Ramirez purportedly acted by written consent as the sole member of the Board.[35] The written consent purported to issue Ramirez 650,000 shares and Pho 450,000 shares (the "Stock Issuance"). It also purported to cancel 50,000 of Bertain's and Foley's shares (the "Stock Cancellation"). The consent recited that Ramirez was the "sole member of the Board of Directors," but that was inaccurate.[36] In January 2022, all four Founders were directors, so Ramirez could not act unilaterally as the sole director.[37]

With the agreements in place, work on the Founders Agreement stalled. Pho and Ramirez feared that Foley and Bertain would use the negotiations over the Founders Agreement to renegotiate the equity restructuring, so they dragged feet. An eventual draft listed items requiring unanimous approval and contained other governance provisions, but the Founders never executed it.[38]

## G.    The Company Fares Poorly.

Unfortunately for the Founders, the Company's sales during the first and second quarters of 2022 did not meet expectations. By summer, the Company's burn rate had become unsustainable. In June, the Founders reduced their own salaries. In

---

[35] JX 104.

[36] *Id.*

[37] Ramirez Tr. 349.

[38] No one could identify who created the draft, but Pho worked on it, and Foley left notes on it. Foley Tr. 67; Pho Tr. 521–22.

September, Ramirez began laying off employees. She also contacted Mike Gilvary, one of the SAFE investors, for cost cutting advice.[39]

Gilvary told Ramirez that she needed to cut deeper and hire a turn-around expert. Gilvary introduced Ramirez to Dan Schneider as a possible interim CEO. Ramirez and Pho began giving Schneider financial information.[40]

Ramirez asked her co-Founders to contact their networks for additional financing. Foley called his father, who loaned an additional $100,000 to the Company in September 2022. The Company agreed to repay the $100,000 in one year, with an optional one-year extension, plus simple interest at twelve percent.

## H. The Split

In October 2022, Ramirez and Pho traveled to Pennsylvania where they met for several days with Schneider. While they were gone, Foley and Bertain found and reviewed Ramirez's files in the Company's shared cloud storage. Bertain discovered a budget forecast—prepared by Ramirez on September 23, 2022—that identified the cost savings achievable from terminating Foley and Bertain.[41] They also discovered

---

[39] *See* JX 159.

[40] Foley and Bertain objected to Ramirez talking to Gilvary without including them and see those communications as evidence of a plot against them. But it makes sense that Ramirez did not include Foley and Bertain in her discussions. Foley and Bertain were responsible for the product development and marketing. As CEO, Ramirez was responsible for managing the business and had always handled the financial side.

[41] JX 196.

that as part of their trip, Ramirez and Pho planned to meet with a New York law firm.[42]

Foley and Bertain panicked. They called Pho and asked if they were being terminated. Pho denied it, but that was not true. Ramirez and Pho had already decided that they needed to fire Foley and Bertain.[43]

On October 7, 2022, the Founders met by video conference. During the meeting, Ramirez terminated Foley and Bertain, effective immediately. On October 10, Ramirez emailed Foley and Bertain confirmation of their final paychecks. She also told them that the Company had exercised its right under the Stock Restriction Agreements to redeem their equity (the "Stock Redemption"). Foley and Bertain each received a total of $19.50 for their shares.

## I.    This Litigation

In February 2023, Foley and Bertain filed this action. They asserted claims for breach of contract, conversion, fraud, and breach of fiduciary duty against Ramirez,

---

[42] Foley and Bertain contend Ramirez and Pho hid the documents from them. This is not accurate. Ramirez kept the documents in a Google Drive folder that all of the Founders could access. Ramirez Tr. 353–54; Foley Tr. 77–79. Ramirez did not affirmatively share the documents with Foley and Bertain, but she also did not conceal them.

[43] Ramirez Tr. 456. Pho claims that Foley and Bertain tried to convince Pho to join them in ousting Ramirez by a vote of three to one. Pho Tr. 560–61. Foley and Bertain were desperate, and that sounds like something they might have done, but Pho was not a credible witness. No other evidence supports his claim.

Pho, and the Company. The court dismissed the breach of contract claim but sustained the other claims. The case proceeded to trial.

## II. LEGAL ANALYSIS

Foley and Bertain sought to prove three claims: conversion, fraud, and breach of fiduciary duty. As a remedy for each claim, they sought money damages equal to the value of their shares. Foley and Bertain proved their claim for conversion. They failed to prove their other claims. Rather than awarding damages, the court awards rescission and restores their lost shares. The court also awards expenses (including attorneys' fees) relating to a discovery dispute.

## A. The Conversion Claim

Foley and Bertain proved at trial that Ramirez, Pho, and the Company converted their shares. Foley and Bertain proved that the Company's Board never authorized the Company to (i) enter into the Stock Cancellation Agreements and the Stock Restriction Agreements, (ii) exercise its purported cancellation rights under the Stock Cancellation Agreements, or (iii) exercise its purported redemption rights under the Stock Restriction Agreements. By acting as if the Company properly redeemed Foley and Bertain's shares, Ramirez, Pho, and the Company engaged in conversion.[44]

---

[44] Foley and Bertain also contend that the Stock Cancellation Agreements and the Stock Restriction Agreements were invalid because they lacked consideration. The court need not reach that argument. Assuming they were valid, the Company never properly exercised its repurchase right.

16

Conversion is an "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it."[45] A plaintiff can establish a claim for conversion by proving that a corporation acquired the plaintiff's shares without authority.[46] That is what happened here.

### 1. The Board Did Not Properly Authorize The Stock Cancellation Agreements and the Stock Restriction Agreements.

Particularly where stock is concerned, Delaware law demands adherence to proper corporate formalities. "The issuance of corporate stock is an act of fundamental legal significance having a direct bearing upon questions of corporate governance, control and the capital structure of the enterprise. The law properly requires certainty in such matters."[47] Only the board has authority to issue stock, unless the board passes a resolution delegating to a person or body the concurrent authority to issue stock.[48] Repurchasing or redeeming corporate stock also requires

---

[45] *McGowan v. Ferro*, 859 A.2d 1012, 1040 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005) (TABLE).

[46] *See Tansey v. Trade Show News Network, Inc.*, 2001 WL 1526306, at *6–7 (Del. Ch. Nov. 27, 2001); *McGowan*, 859 A.2d at 1040.

[47] *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991). In *STAAR Surgical*, the Delaware Supreme Court held that a defective issuance was void and impossible to fix. The Delaware General Assembly eventually established avenues for validating failures of authorization. *See* 8 *Del. C.* §§ 204 & 205. To the extent that *STAAR Surgical* contemplated incurability, those statutes abrogated that aspect of the decision. *See Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 931 (Del. 2023). Otherwise, *STAAR Surgical* remains good law, including on the importance of corporate formalities.

[48] *See* 8 *Del. C.* §§ 152(a) & (b), 161.

17

board action.[49] Evidencing the need for board involvement, the Delaware General Corporation Law (the "DGCL") makes directors personally liable, jointly and severally, if they repurchase or redeem stock when the corporation's capital is impaired.[50] The Company's Bylaws confirm that requirement by stating that the Board must authorize "stock purchase[s]."[51]

Given their subject matter and significance, formal board action was required to authorize the Company to enter into the Stock Cancellation Agreements and the Stock Restriction Agreements. Under the DGCL, valid board action can take two forms:

> Unless otherwise restricted by the certificate of incorporation or bylaws, (1) any action required or permitted to be taken at any meeting of the board of directors or of any committee thereof may be taken without a meeting if all members of the board or committee, as the case may be, consent thereto in writing, or by electronic transmission, and (2) a consent may be documented, signed and delivered in any manner permitted by § 116 of this title.[52]

---

[49] *See id.* §§ 151 & 160.

[50] *See id.* §§ 172 & 174.

[51] JX 2 § 2.1.

[52] 8 *Del. C.* § 141(f).

18

The first form involves action by a majority of a quorum of directors at a duly called and convened board meeting.[53] The second involves unanimous director action by written consent.[54] A non-unanimous director consent is invalid as a matter of law.[55]

There was no valid board action authorizing the Company to enter into the Stock Cancellation Agreements. A quorum of the Board never convened and approved a resolution authorizing those agreements. Ramirez purported to act by written consent to authorize them, but all of the Founders were directors when she purported to act. Her attempt to act as the sole director was not valid. It merely provides evidence that board action was necessary and not obtained.

There was no purported board action of any kind authorizing the Company to enter into the Stock Restriction Agreements. No resolution. No written consent. Nothing.

Ramirez and Pho argue that the Mediation Agreement authorized the Company to enter into the Stock Cancellation Agreements and Stock Restriction Agreements. Ramirez and Pho claim that when they entered into the Mediation Agreement, the Founders acted not only individually but also as directors, meaning

---

[53] *Id.* § 141(b).

[54] *Id.* § 141(f); *see also Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 426–30 (Del. Ch. 2020) (finding that a director who purported to act as the "sole remaining director" could not act by written consent because the company's board of directors had three seats and thus the sole director could not meet a quorum requirement).

[55] *Solstice Cap. II, L.P. v. Ritz*, 2004 WL 765939, at *1 (Del. Ch. Apr. 6, 2004).

that the Mediation Agreement constitutes board action sufficient to authorize everything that came afterward.

Ramirez and Pho cannot rely on the Mediation Agreement for two reasons. First, Bertain and Foley entered into the Mediation Agreement in reliance on Ramirez and Pho's promise to provide them with protections in the form of a Founders Agreement, and that condition was never met. Second, the Mediation Agreement did not constitute the board-level action necessary to authorize the Company to enter into the Stock Cancellation Agreements and Stock Restriction Agreements. The Mediation Agreement was neither a valid board resolution nor valid action by written consent.

Ramirez and Pho next argue that the May 2018 written consent gave Ramirez the authority to cause the Company to enter into the Stock Cancellation Agreements and the Stock Restriction Agreements. That resolution authorized the initial stock grants to the Founders. Those grants allowed the CEO to "refrain from making or alter the number of shares of any Grant listed above, or make additional Grants to the same to other persons."[56] The May 2018 written consent also authorized Ramirez to "sign and make such addenda and modifications to the Grant Documents as the CEO deems appropriate, and to extend engagement agreements on behalf of Session promising stock grants."[57]

---

[56] JX 8 Art. 4.

[57] *Id.*

Ramirez and Pho cast the Stock Cancellation Agreements and the Stock Restriction Agreements as amendments to the Stock Grant Notices, but they were not. The Stock Grant Notices referenced transactions that were complete after the Founders received their initial allotments of 2,000,000 shares each. The Stock Cancellation Agreements purported to change the number of shares each Founder owned, but that was a new transaction. The Stock Cancellation Agreements did not modify the original stock grants from more than three years before. The Stock Restriction Agreements likewise purported to unvest the shares each Founder owned. That too was a new transaction, not a modification to the original stock grants.

Ramirez and Pho finally argue that the Board's failure to properly authorize the Company to enter into the Stock Cancellation Agreements and the Stock Restriction Agreements does not matter because the Company did not follow corporate formalities. They argue that "[i]t is the very nature of equity to look beyond form to the substance of an arrangement."[58]

Ramirez and Pho's appeal to equity misunderstands the difference between review at law and review in equity. Professor Adolf Berle famously stated that,

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those

---

[58] *Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007).

which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[59]

Delaware follows the twice-tested principle.[60]

The proposition that equity regards the substance rather than the form applies when a court asks whether fiduciaries have complied with their duties—a "Berle II claim."[61] By contrast, formality matters when assessing compliance with "the technical rules having to do with the existence and proper exercise of [corporate] power"[62]—a "Berle I claim."

> [T]he entire field of [business entity] law has largely to do with formality. [Business entities] come into existence and are accorded their characteristics, including most importantly limited liability, because of formal acts. Formality has significant utility for business planners and investors. While the essential fiduciary analysis component of [business entity] law is not formal but substantive, the utility offered by formality in the analysis of our statutes has been a central feature of Delaware [business entity] law.[63]

---

[59] Adolf A. Berle, *Corporate Powers As Powers In Trust*, 44 Harv. L. Rev. 1049, 1049 (1931).

[60] *CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 397 (Del. 2023); *In re Invs. Bancorp, Inc. S'holders Litig.*, 177 A.3d 1208, 1222–23 (Del. 2017), *as revised* (Dec. 19, 2017).

[61] On the distinction between Berle I claims and Berle II claims, *see W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 310 A.3d 985, 1003–04 (Del. Ch. 2024).

[62] Berle, *supra*, at 1049.

[63] *Uni–Marts, Inc. v. Stein*, 1996 WL 466961, at *9 (Del. Ch. Aug. 12, 1996) (Allen, C.); *accord Speiser v. Baker*, 525 A.2d 1001, 1008 (Del. Ch. 1987) (Allen, C.), *appeal denied*, 525 A.2d 582 (Del. 1987) (TABLE); *see also In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2014 WL 5667334, at *8 (Del. Ch. Nov. 5, 2014), *aff'd sub nom. Haynes Fam. Tr. v. Kinder Morgan G.P., Inc.*, 135 A.3d 76 (Del. 2016).

Not following corporate formalities is a problem, not a defense.

Without valid Board action, the Company never properly entered into the Stock Cancellation Agreements or the Stock Restriction Agreements. Those agreements were nullities.[64]

### 2. The Company Could Not Unilaterally Engage In The Stock Cancellation.

Without a valid agreement to effectuate the Stock Cancellation, the Company could not cancel 50,000 of Foley and Bertain's shares. The DGCL does not authorize a corporation to cancel its shares unilaterally. Stock is personal property,[65] and a corporation has no power to deprive a stockholder of its property by fiat. A charter amendment can cancel shares, as can a merger.[66] Otherwise, the owner of shares must agree to give them up. The Stock Cancellation was invalid for that reason as well.

---

[64] By the same logic, the Stock Issuance was invalid. The Board did not validly authorize the Stock Issuance: Ramirez purported to authorize the issuance by acting by written consent as the sole director, but she was not the sole director when she purported to act. Nor had the Board given Ramirez the authority to approve the Stock Issuance. Neither the Charter nor the Bylaws made any attempt to deviate from the requirement of director involvement. The Bylaws require specific action to confer "on any officer the power to issue and sell shares of stock . . . ." JX 2 § 2.1. The Stock Issuance is therefore voidable at Foley and Bertain's behest.

[65] 8 *Del. C.* § 159.

[66] *See id.* §§ 242(a)(4), 251(a)(5).

### 3. The Board Did Not Properly Authorize The Company To Exercise Its Repurchase Right.

Ramirez purported to cause the Company to exercise its repurchase rights under the Stock Restriction Agreements in her capacity as CEO. But the Company never properly entered into the Stock Restriction Agreements, so the Company did not possess any right to repurchase Foley and Betain's shares that Ramirez could exercise.

Assuming the Stock Restriction Agreements were valid, the exercise of those rights required board action. As discussed previously, formal board action is required when a corporation repurchases or redeems stock.[67] The redemption here was especially significant. Ramirez purported to cause the Company to repurchase 48% of its equity and eliminate half of its stockholder base. An act of that magnitude required a foundation in the board's plenary authority under Section 141(a) of the DGCL.[68] It went beyond what a CEO could do unilaterally.[69]

### 4. Foley and Bertain Proved Their Conversion Claim.

The Company did not have the authority to deprive Foley and Bertain of their shares. No one properly exercised the Company's corporate power to enter into the

---

[67] *See id.* §§ 151 & 160.

[68] *See id.* § 141(a).

[69] This decision does not stand for the proposition that a CEO can never exercise a corporation's rights under a stock repurchase agreement. This decision only holds that on these facts, the exercise of the repurchase right required the Board's approval.

Stock Cancellation Agreements or the Stock Restriction Agreements. Without the Stock Cancellation Agreements, the Company could not cancel 50,000 of Foley and Bertain's shares. Without the Stock Restriction Agreements, the Company could not repurchase the rest of their shares. And on the facts of this case, Ramirez could not have exercised the repurchase right unilaterally as CEO without the Board's authorization. By acting as if Foley and Bertain no longer owned shares, Ramirez, Pho, and the Company committed the tort of conversion.

## B. The Common Law Fraud Claim

Foley and Bertain separately asserted that Ramirez and Pho committed fraud. To prove that claim, Foley and Bertain had to show that Ramirez and Pho (i) made a false representation, (ii) knew of its falsity or were recklessly indifferent to its truth, and (iii) intended to induce Foley and Bertain to act on the representation. Additionally, Foley and Bertain had to show that they (iv) reasonably relied on the representation and (v) suffered causally related damages.[70] Here, Foley and Bertain failed to prove by a preponderance of the evidence that Ramirez and Pho made false representations.

Under Delaware law, fraud can take the form of "(1) an overt misrepresentation; (2) silence in the face of a duty to speak; or (3) active concealment

---

[70] *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

25

of material facts."[71] Foley and Bertain identified several statements they believe to be false.

First, Foley and Bertain claim that Ramirez and Pho lied about the Company requiring outside investment. But that was not a misrepresentation of fact. It reflected Ramirez and Pho's opinion about the Company's need for capital. An opinion is not actionable as fraud unless the speaker either did not hold that opinion or did not have a good-faith basis for it.[72] Ramirez and Pho honestly believed that the Company needed capital and had a good-faith basis for that belief. When sales surged in March 2020, the Company lacked working capital. Ramirez and Pho appropriately viewed outside funding as a solution. Foley and Bertain may have disagreed, but that difference of opinion cannot support a claim of fraud.

Second, Foley and Bertain claim that Ramirez and Pho falsely represented that an equity restructuring was necessary to obtain outside investment. That too was an opinion. Ramirez testified credibly that she understood from participating in an incubator module on fundraising that outside investors wanted to see an equity structure consistent with clear leadership. She sincerely believed that investors would not back the Company's existing structure, where there were four equal co-

---

[71] *In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 965 A.2d 763, 804 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011) (TABLE).

[72] *See Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 148 (Del. Ch. 2004); *Mooney v. E. I. du Pont de Nemours and Co.*, 2017 WL 5713308, at *6 (Del. Super. Nov. 28, 2017).

founders. She thought that reallocating the Founders' equity so that the CEO held the largest stake would make the Company more attractive.[73] She shared what she learned with Pho, Foley, and Bertain.[74] Pho shared her view. Ramirez and Pho sincerely held that belief.

Ramirez and Pho may not have been correct. They presented no evidence about prevailing market practices. They also did not identify any investors who passed on the Company because of its capital structure. Their assertion that an investor would be concerned about deadlock also rings hollow, because any new shares would immediately constitute the swing votes. That would give the investor leverage rather than putting them at risk. An investor also could protect itself by specifying voting and blocking rights in a series of preferred stock. But the question is not whether Ramirez and Pho were right. The question is whether they honestly believed that a restructuring was warranted and had a good-faith basis for their belief. They did.

Foley and Bertain argue that Ramirez knew an equity restructuring was unnecessary and used it as a pretext for her real objective: obtaining the additional equity she had always wanted. The evidence shows that Ramirez had mixed motives. She asked for more equity as early as February 2020. She felt she deserved more equity because she was working more than anyone else. She also told the startup

---

[73] *See* Ramirez Tr. 307–08, 312–16.

[74] Foley Tr. 44–45; Ramirez Tr. 307–08.

attorney in May 2021 that one of her goals was "to redistribute the equity fairly."[75] Later that summer, she again raised the issue of redistributing equity, this time adding the argument about fundraising after participating in the incubator module and discussing the issue with the startup attorney. In short, she wanted more equity for herself, while also believing that an equity restructuring would help the Company. The latter is sufficient to defeat Foley and Bertain's claim of fraud.

Third, Foley and Bertain claim they were promised that if they agreed to an equity restructuring, Ramirez and Pho would enter into a Founders Agreement containing minority stockholder protections. Foley and Bertain never got the Founders Agreement, but was that due to fraud?

A defendant's insincere promise to perform may constitute promissory fraud if, when the promise was made, the defendant either lacked the intent to perform or knew that performance was impossible.[76] Simply failing to fulfill a promise is not fraud.[77] It might support a different legal theory, but not fraud.

Although the question is close, Foley and Bertain failed to prove by a preponderance of the evidence that Ramirez and Pho did not intend to enter into a Founders Agreement during the mediation. It is more likely than not that during the

---

[75] JX 99.

[76] *See Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *7 (Del. Ch. Dec. 23, 2008).

[77] *See Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009).

28

mediation, Ramirez and Pho intended to follow through on the Founders Agreement. Consistent with that reality, Pho worked on the Founders Agreement after the mediation.[78] The problem was that for Ramirez and Pho, the Founders Agreement "was not a priority."[79] It eventually fell by the wayside and was never finalized.

Foley and Bertain did not get what they were promised. The Mediation Agreement rested on a condition—the execution of the Founders Agreement—that was never fulfilled. That has consequences, but it does not support a claim for fraud.

Judgment will be entered in favor of Ramirez and Pho on the fraud claim.

## C. The Claims For Breach Of Fiduciary Duty

Last, Foley and Bertain sought to prove that Ramirez and Pho breached their fiduciary duties. As directors, Ramirez and Pho owed a duty of disclosure to Foley and Bertain in their capacities as stockholders. And as directors, Ramirez and Pho owed a duty of disclosure to Foley and Bertain in their capacities as directors. But Foley and Bertain failed to prove that Ramirez and Pho breached that duty.

### 1. The Stockholder-Capacity Claim

Foley and Bertain first rely on their status as stockholders. Directors of a Delaware corporation owe two fiduciary duties to the corporation and its stockholders: care and loyalty.[80] The "duty of disclosure is not an independent duty,

---

[78] Foley Tr. 67.

[79] Foley Tr. 68.

[80] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

29

but derives from the duties of care and loyalty."[81] It reflects the application of the more general duties "in a specific context."[82] When a court confronts a disclosure claim, it "therefore must engage in a contextual specific analysis to determine the source of the duty, its requirements, and any remedies for breach."[83]

Ramirez and Pho argue that the relevant context involves directors purchasing shares from an existing outside stockholder. In *Lank v. Steiner*,[84] the Delaware Supreme Court adopted the "special facts doctrine," which seeks to balance the duties of a director when engaging in a one-on-one transaction with a stockholder to buy or sell shares with the director and stockholders' ability to transact voluntarily. The doctrine arguably fails to give enough credence to the director's role as a fiduciary and greater access to information, but it remains the governing standard.

Under the special facts doctrine, a director has a fiduciary duty to disclose information in a one-on-one transaction with a stockholder "only when a director is possessed of special knowledge of future plans or secret resources and deliberately misleads a stockholder who is ignorant of them."[85] If so, then the director has a duty

---

[81] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) (internal quotation marks omitted).

[82] *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001).

[83] *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013).

[84] 224 A.2d 242 (Del. 1966).

[85] *Id*. at 244.

to reveal the special fact.[86] But the special facts doctrine applies only when "directors buy stock directly from, or sell stock directly to, an existing outside stockholder—that is, a stockholder who is not a director, officer or controlling stockholder."[87] Foley and Bertain were not only stockholders; they were also directors. They had the same access to information as Ramirez and Pho. The special facts doctrine does not apply.

Foley and Bertain also did not sell their shares to Ramirez and Pho in the type of transaction that the special facts doctrine envisions. That doctrine envisions a scenario in which a director offers to buy or sell shares from a stockholder at a given price, knowing that the price materially misvalues the shares due to a special fact. Foley and Bertain agreed to a restructuring to resolve an ongoing disagreement. The restructuring primarily addressed control, and although it involved changes in equity ownership, it was not a purchase or sale. The special facts doctrine again does not apply.

Ramirez and Pho nevertheless owed a duty to "exercise due care, good faith and loyalty" when they chose to "communicate . . . directly with shareholders about the corporation's affairs, with or without a request for shareholder action."[88] When,

---

[86] *Wayport*, 76 A.3d at 315.

[87] Lawrence A. Hamermesh, *Calling Off the* Lynch *Mob: The Corporate Director's Fiduciary Disclosure Duty*, 49 Vand. L. Rev. 1087, 1103 (1996).

[88] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

as here, the transaction does not involve stockholder action, that means the directors must speak honestly.[89]

To support their claim for breach of the duty to speak honestly, Foley and Bertain rely on the same statements that formed the basis for their fraud claim. This decision has already concluded that Ramirez and Pho did not deliberately mislead Foley and Bertain. The breach of fiduciary duty claim fails for that reason as well.

### 2. The Director-Capacity Claim

Foley and Bertain also rely on their status as directors. Delaware law recognizes that a director's duties of care and loyalty manifest in part as "an unremitting obligation to deal candidly with their fellow directors."[90] Because directors have both the power and the obligation to direct and oversee the business and affairs of the corporation, they must keep themselves and their fellow directors informed of relevant information. Delaware's board-centric model expects directors to share information, debate issues, and reach an informed decision.[91]

---

[89] *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020).

[90] *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (internal quotation marks omitted); *accord Crescent/Mach I P'ship, L.P. v. Turner*, 2007 WL 1342263, at *3 (Del. Ch. May 2, 2007).

[91] *See* J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 37 (Winter 2014/2015) (citing *Lippman v. Kehoe Stenograph Co.*, 11 Del. Ch. 80, 88, 95 A. 895, 899 (Del. Ch. 1915) ("Each member of a corporate body has the right to consultation with the others and has the right to be heard upon all questions considered.")).

Foley and Bertain analogize their situation to *VGS, Inc. v. Castiel*.[92] That decision involved a limited liability company managed by three members. Two acted by non-unanimous written consent (permissible in the LLC context) to strip the third member of his majority ownership interest in the company. If the two members had given the third member notice, then he could have exercised his rights as the majority member to remove the other members and maintain his control. The court held that the two members acted in bad faith by intentionally using a procedurally defective merger to eliminate the third member's majority interest.[93]

I have criticized *VGS*.[94] But even taking *VGS* at face value, the case is distinguishable. *VGS* involved two member-managers seeking to protect the LLC from self-interested conduct by the majority controller where it was necessary for them to plan in secret and act without alerting the controller lest the controller preempt their efforts. The court viewed the secret planning as inequitable, regardless of whether it was necessary to protect the entity. In doing so, the court elevated the directors' duty to the controller over their duties to the entity. I would have balanced the equities differently, given more weight to the directors' good faith efforts to

---

[92] 2000 WL 1277372 (Del. Ch. Aug. 31, 2000), *aff'd,* 781 A.2d 696 (Del. 2001) (TABLE).

[93] *Id*. at *16.

[94] *See Klaassen v. Allegro Dev. Corp.,* 2013 WL 5967028, at *10–12 (Del. Ch. Nov. 7, 2013), *aff'd,* 82 A.3d 730 (Del. 2013) (TABLE); *Klaassen v. Allegro Dev. Corp.,* 2013 WL 5739680, at *14 n.6 (Del. Ch. Oct. 11, 2013), *aff'd*, 106 A.3d 1035 (Del. 2014).

protect the entity, and concluded that the directors could pursue the path they believed was necessary without engaging in self-sabotage.

This case does not involve any secret planning or action without notice. Ramirez repeatedly asked for equity restructuring. The principals discussed the restructuring for months. They ultimately agreed on the broad outlines of the restructuring during a mediation, and they memorialized the concepts in the Mediation Agreement. Foley and Bertain have asserted that Ramirez and Pho concealed their intent never to enter into the Founders Agreement, and that could amount to inequitable deception, but this decision has rejected that assertion. The type of taint that led to the outcome in *VGS* does not infect the Mediation Agreement, the Stock Cancellation Agreements, or the Stock Restriction Agreements.

Bertain and Foley also sought to prove that Ramirez and Pho breached the duties they owed to Bertain and Foley as directors when acting in secret to terminate them as employees. That was not a fiduciary breach. Directors do not owe fiduciary duties to other constituencies, such as employees, customers, suppliers, and

creditors.[95] The Delaware Supreme Court has held that "contractual rights as an employee . . . are separate from [ ] rights as a stockholder."[96]

If Bertain and Foley had been board-appointed officers, then only the Board could have terminated them. At that point, there would be a threshold failure of authorization (Berle I) in addition to any fiduciary wrong (Berle II). Bertain and Foley selected for themselves the titles of Chief Creative Officer and Chief Product Officer, but those were not Board-appointed positions. They were nice sounding names for their employee roles. In her capacity as CEO, Ramirez had the power to fire Bertain and Foley. Their terminations did not require Board action.

Ramirez also had no obligation to inform Foley and Bertain in advance that she intended to terminate them as employees. When carrying out the termination, Ramirez owed duties as an officer that ran to the Company and its stockholders as a

---

[95] *See, e.g., N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (holding that the directors of a solvent corporation only owe fiduciary duties to the corporation and its stockholders); *McRitchie v. Zuckerberg*, 315 A.3d 518, 548 (Del. Ch. 2024) (finding that creditor plaintiffs failed to state a claim for breach of fiduciary duty, "because creditors never become the beneficiaries of director duties, and "[t]he same principle applies to holders of other contractual rights against the corporation, be they customers, suppliers, or employees"); Julian Velasco, *The Fundamental Rights of the Shareholder*, 40 U.C. Davis L. Rev. 407, 439 (2006) ("Whether directors are understood as agents, as trustees, or otherwise, the fact that they control the business does not negate the fact that the shareholders are the beneficial owners. Thus, under the traditional view, directors owe fiduciary duties to the shareholders, and only to the shareholders. There is no room for talk of 'stakeholders' or 'other constituencies.' All other parties—creditors, employees, communities—are, simply put, third parties. They are owed no fiduciary duties and have no legitimate role in corporate governance." (footnotes omitted)).

[96] *Riblet Prods. Corp. v. Nagy*, 683 A.2d 37, 40 (Del. 1996).

whole.[97] She did not owe any duties to Foley and Bertain in their capacity as employees.[98] She believed in good faith that terminating them without prior notice served the best interests of the Company. She did not face any conflict of interest except to the extent that she would benefit as a stockholder, which is not a cognizable conflict under Delaware law.[99] And she was not grossly negligent. The business judgment rule therefore protects her decision, both on the merits and as to her manner of proceeding.[100]

Foley and Bertain failed to prove that Ramirez and Pho breached duties that they owed as directors to Foley and Bertain as fellow directors.

---

[97] *McRitchie*, 315 A.3d at 550 (discussing director duties toward stockholder collective versus duties toward individual stockholders); *see also Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) (holding that directors did not owe any fiduciary duties to retired executives in their capacities as stockholders when exercising a redemption right).

[98] *Riblet Prods. Corp.*, 683 A.2d at 40 (holding that directors did not owe any fiduciary duties to employee as stockholder for purposes of exercising termination right).

[99] *See Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 958 (Del. 1985) (explaining that directors were not interested in selective stock repurchase that benefitted them proportionately in their capacity as stockholders); *id.* ("Nor does this become an 'interested' director transaction merely because certain board members are large stockholders. As this Court has previously noted, that fact alone does not create a disqualifying 'personal pecuniary interest' to defeat the operation of the business judgment rule.").

[100] *See generally Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 2025 WL 1807887, at \*18–25 (Del. Ch. June 30, 2025).

**D.      The Remedy For Conversion**

Foley and Bertain proved their claim for conversion. As a remedy, they ask for value of the property at the time of conversion, plus interest. They seek $2.4 million, representing what they claim was the value of their shares on the conversion date. That remedy is unwarranted because the valuation is too speculative. Instead, the court will award rescission.

**1.      Damages Are Too Speculative.**

The court can award damages based on "a responsible estimate" of the stock's value, determined through "a good faith effort to craft a sensible remedy."[101] "Valuation of start-up companies with . . . no consistent income stream is difficult."[102] "Often, the kind of companies that are valued are the hardest to price because they lack reliable earnings histories . . . ."[103]

The Company was a startup business that had never turned a profit. It also operated in the cannabis industry, where an uncertain regulatory environment created additional risk.[104] The principal valuation indications are the Company's

---

[101] *Tansey v. Trade Shows News Network, Inc.*, 2002 WL 31521092, at *1 (Del Ch. Oct. 28, 2002).

[102] *Gentile v. Rossette*, 2010 WL 2171613, at *6 (Del. Ch. May 28, 2010).

[103] *Finkelstein v. Liberty Digit., Inc.*, 2005 WL 1074364, at *13 (Del. Ch. Apr. 25, 2005).

[104] *See DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 349 (Del. 2017) (finding that regulatory developments relevant to a company's appraisal posed risks and that "the company's value was not as reliable as under ordinary conditions").

marketing materials for the SAFE round, the projections they contain, and the SAFE

round itself. None of those materials are sufficiently non-speculative to support a

damages remedy. The projections were Ramirez's best guesses. The marketing

materials were puffery. And the point of a SAFE is to provide financing for a startup

that does not have a reliable valuation.[105] The SAFE structure self-referentially

defeats its reliability as a valuation indicator.[106]

## 2. Rescission

A more appropriate remedy is rescission.[107] That remedy reverses a

transaction and returns the parties to the status quo.[108] A court of equity can award

---

[105] *See* Carolynn Levy, *Safe Financing Documents*, https://www.ycombinator.com/documents.

[106] Perhaps there could be a scenario where a court could rely on a SAFE to value a company, but that case has not been made here.

[107] *See* John Norton Pomeroy, *Pomeroy's Equity Jurisprudence*, vol. 1 § 112.6 (Bancroft-Whitney Company ed., 3d ed. 1905) ("[A] [remedy] of [r]escission . . . by which an instrument, contract, deed, judgment, and even sometimes a legal relation itself subsisting between two parties, is, for some cause, set aside, avoided, rescinded, or annulled."). *See also id.* § 171.2 ("The second class of [exclusively equitable remedies, which includes rescission,] operate *indirectly* to establish or protect primary rights, either legal or equitable. They do not expressly nor directly declare, establish, and enforce the ultimate right . . . ; but their object is to perfect and complete the means by which such right . . . is evidenced or secured . . . or to remove obstacles which hinder the enjoyment of such right.") (emphasis in original).

[108] *Norton v. Poplos*, 443 A.2d 1, 1 (Del. 1982); *accord In re MAXXAM, Inc.*, 659 A.2d 760, 775 (Del. Ch. 1995) ("Rescission entails avoiding a transaction . . . and requires that the parties be restored to the *status quo* before the avoided transaction was consummated."). *See generally* Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies: Damages-Equity-Restitution* § 4.3(6), at 422 (3d ed. 2018).

rescission to "restore[ ] the parties substantially to the position which they occupied before making the contract."[109]

Rescission is the appropriate remedy here. The Stock Cancellation and Stock Redemption were purportedly accomplished through improperly authorized agreements. Those transactions deprived Foley and Bertain of their personal property: their shares.

Rescinding the Stock Cancellation is simple. The Company must reissue 50,000 shares to Foley and 50,000 shares to Bertain.

Rescinding the Stock Issuance is only marginally more complex. The Company must reissue 1,950,000 shares to Foley and 1,950,000 shares to Bertain. Foley and Bertain must each repay to the Company the $19.50 that they received for their shares.

Foley and Bertain must also pay interest. The Company paid them $19.50 each on October 10, 2022. Put colloquially, Foley and Bertain received 2022 dollars. They are getting back shares with whatever value the equity has in 2025, so they must pay back the $19.50 in 2025 dollars. The mechanism for making that adjustment is an award of pre- and post-judgment interest.

---

[109] 3 Bradley W. Voss, *Voss on Delaware Contract Law* § 15.23 (2025) (quoting *Kuramo Cap. Mgmt., LLC v. Seruma*, 2024 WL 1888216, at *42 (Del. Ch. Apr. 30, 2024)); *see also Russell v. Universal Homes, Inc.*, 1991 WL 94357, at *2 (Del. Ch. May 23, 1991) (citing 12A C.J.S. *Cancellation of Instruments* § 12).

The Court of Chancery generally looks to the legal rate of interest.[110] But the court "has broad discretion, subject to principles of fairness, in fixing the [interest] rate to be applied."[111] The court can depart from the legal rate if  different rate or series of rates is fairer and more accurate.[112] "A fluctuating interest rate adequately reimburses a [party] . . . by replicating the economic circumstances that existed during the litigation."[113]

The legal rate in October 2022 was 8.25%. That rate risks overcompensating the Company. Rates were historically low during the COVID-19 pandemic, when the federal discount rate reached 0.25%. During the ensuing thirty-two months, the discount rate changed ten times, increasing to 4.5%.

To make the interest calculation fair, the legal rate must change with changes in the underlying Federal Discount Rate. Interest will compound quarterly.

---

[110] *See Murphy Marine Servs. v. GT USA Wilm., LLC*, 2022 WL 4296495, at *24 (Del. Ch. Sept. 19, 2022).

[111] *Israel Disc. Bank of N.Y. v. First State Depository Co., LLC*, 2013 WL 2326875, at *28 (Del. Ch. May 29, 2013) (quoting *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988)).

[112] *Ramunno v. Capano*, 2006 WL 1830080, at *1 (Del. Ch. June 23, 2006), *aff'd*, 922 A.2d 415 (Del. 2007) (TABLE).

[113] *Levey v. Browstone Asset Mgmt., LP*, 2014 WL 4290192, at *1 (Del. Ch. Aug. 29, 2014); *see also Gentile v. Rossette*, 2010 WL 3582453, at *2 (Del. Ch. Sept. 1, 2010) (declining to award a fixed interest rate when "the Discount Rate frequently stood near all-time lows and the equity markets encountered turbulence").

## E.     A Clean-Up Item From Discovery

There is one last clean-up item. During discovery, the plaintiffs filed a motion to compel. The court appointed Tara S. Emory as a discovery facilitator.[114] With her assistance, the defendants supplemented their document production. The parties implemented their resolution through stipulation and proposed order that withdrew the motion to compel without prejudice, but with the plaintiffs reserving their right to seek expenses (including attorneys' fees) under Rule 37(a)(4)(A). The plaintiffs again reserved their right to seek expenses in the pre-trial order. They sought their expenses in post-trial briefing.

> Rule 37(a) states:
>
> If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the Court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including the attorney's fees, unless the Court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.[115]

Expense shifting is mandatory "'unless the Court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.'"[116] Rule 37 does not shift expenses as a sanction in the same sense

---

[114] Dkt. 61.

[115] Ct. Ch. R. 37(a)(4)(A).

[116] *Cartanza v. Cartanza*, 2013 WL 3376964, at *2 (Del. Ch. July 8, 2013) (quoting Ct. Ch. R. 37(a)).

as Rule 11 or an award under the bad faith exception to the American Rule. Rule 37 calls for presumptive expense shifting to force parties to internalize the costs of their discovery positions which should reduce the number of discovery disputes.

Here, the defendants' opposition to the motion to compel was not substantially justified. The discovery issues began when Ramirez and Pho self-collected their electronically stored information ("ESI").[117] Ramirez and Pho had also made their own threshold determinations of responsiveness before providing ESI to counsel.[118] Counsel produced only 1,229 documents, many with insufficient metadata or custodian information. The plaintiffs asked the defendants to run search terms on Ramirez and Pho's data to address potential issues associated with self-collection. The defendants declined.

Another issue involved Foley and Bertain's email accounts, which they had lost access to when they were terminated. The plaintiffs asked the defendants to collect from Foley and Bertain's accounts as well. The defendants declined.

The plaintiffs moved to compel. Only after the briefing concluded and with the assistance of the discovery facilitator did the defendants agree to the plaintiffs' requests. The defendants produced another 2,108 documents, totaling 6,050 pages. The plaintiffs then withdrew the motion to compel as moot.

---

[117] *See* Ramirez Dep. 24–32; Pho Dep. 131–33.

[118] *See* Ramirez Dep. 24–32; Pho Dep. 131–33.

The defendants' opposition to the motion to compel was not substantially justified. Their supplemental production gave the plaintiffs all of the relief they originally sought. The plaintiffs are entitled to reimbursement of their expenses. If the parties cannot agree on an amount, then the plaintiffs may file a motion to quantify the award, supported by a Rule 88 affidavit.

## III.   CONCLUSION

Judgment will be entered on the conversion claim in favor of Foley and Bertain and against Ramirez, Pho, and the Company. Otherwise, judgment will be entered in favor of Ramirez and Pho and against Foley and Bertain. The remedy for the conversion claim is rescission.

Within thirty days, the parties must submit a proposed final order, agreed to as form, that implements the rulings made in this opinion. If there are issues to address before a final order can be entered, then the parties must submit a joint letter identifying those issues and proposing a path forward. Any remaining items must be existing issues that need to be addressed to resolve this proceeding. This instruction is not an invitation for the parties to raise new issues or seek a do-over.